**AFFIRMED; Opinion Filed September 2, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-00343-CV

## IN THE INTEREST OF N.T., A CHILD

**On Appeal from the 256th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-04-10316-Z**

### No. 05-15-00838-CV

## IN THE INTEREST OF M.T., A CHILD

**On Appeal from the 302nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-06-08087-U**

## OPINION

Before Justices Lang, Stoddart, and Schenck
Opinion by Justice Lang

Following a jury trial, the trial court signed a decree in which it (1) terminated the parental rights of appellant, S.T. ("Mother"), respecting two of her children, N.T. and M.T. ("the children"),[1] and (2) appointed the Texas Department of Family and Protective Services ("the Department") permanent managing conservator of the children.[2] In five issues on appeal, Mother contends the evidence is legally and factually insufficient to support (1) the jury's

---

[1] In this opinion, we use initials to identify appellant and her two children. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014); TEX. R. APP. P. 9.8(b).

[2] The rights of the biological fathers of N.T. and M.T. have been terminated and are not at issue in this appeal.

findings that she committed one or more of the three acts alleged in support of termination of her parental rights and such termination is in the best interest of the children and (2) appointment of the Department as managing conservator of the children.

We decide against Mother on her first, fourth, and fifth issues. We need not address Mother's second and third issues. The trial court's judgment is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In December 2009, the Department received referrals that N.T. and M.T. were living in unsanitary and unstable conditions with Mother, who had been diagnosed as bipolar and schizophrenic. At that time, N.T. and M.T. were ages six and four, respectively. After investigating, the Department took custody of the children and filed a suit affecting the parent–child relationship. The parties reached an agreement to appoint a maternal aunt, S.C., as sole managing conservator of the children and allow Mother supervised visitation.

Subsequently, in March 2012, the Department discovered S.C. was physically abusing M.T. and removed the children from S.C.'s custody. The Department moved for conservatorship of both children[3] and sought to terminate Mother's parental rights if reunification could not be achieved. Following a bench trial in March 2013, the trial court found in the Department's favor and terminated Mother's parental rights.

In a 2014 appeal to this Court, Mother argued she received ineffective assistance of counsel when her appointed counsel failed to challenge the subsection of the statute under which her parental rights were terminated as an unconstitutional retroactive law as applied to her. This Court reversed the trial court's judgment and remanded the cases for a new trial.[4]

---

[3] Two separate cases were filed by the Department and were consolidated for trial.

[4] *See In re N.L.T.*, 420 S.W.3d 469 (Tex. App.—Dallas 2014, pet. denied).

A three-day jury trial commenced in February 2015. Among the witnesses called by the Department was Officer Christopher Slone of the Dallas Police Department. Slone testified that on June 11, 2014, he was dispatched to a "major disturbance" at an apartment complex. According to Slone, when he arrived at the scene, Mother was "crying hysterically" and "kept saying that she was full of rage, and she wanted to hurt somebody" and "then she would stop and she would be talking normal." Slone testified it was determined that Mother was a danger to herself or others and she was taken into police custody. He stated police took her to Green Oaks Hospital, which is a "psychiatric facility." On cross-examination, Slone testified (1) Mother did not try to hurt anyone at the apartment complex and was "fairly calm" once she was secured in the squad car and (2) he did not know who had called police to report the disturbance.

Welby Pinny testified he is a family therapist at Momentous Institute,[5] a "community mental health center." Pinny testified he provided family therapy services for Mother and the children over a period of several years starting in 2006 when Mother approached that organization for assistance with housing, the behavior of the children, and her own mental state. Pinny's written records and notes pertaining to Mother and the children were admitted into evidence. According to Pinny, (1) N.T. was "developmentally delayed," "aggressive," and "very destructive" and had told Mother she was sexually abused by her father, and (2) M.T. was "autistic." Pinny stated Mother told him she and the children lived in a "Section 8 housing apartment" that she felt was unsafe and she wanted to relocate to a safer area. Also, Mother told Pinny that although she "has had negative experiences with her family" and generally does not depend upon family members to help her, she has an uncle who is "helpful" to her. Pinny testified that in June 2011, there was "a parting of ways" between Mother and Momentous Institute. He stated that at that time, he wrote in his notes (1) "[Mother] is unable to handle

_____

[5] According to Pinny, Momentous Institute "used to be Salesmanship Club Youth and Family Services."

–3–

[N.T.] behaviorally"; (2) "[Mother's] ability to parent appear [sic] to vary with her ability to self care, which fluctuated"; and (3) "the needs of the family exceed what can be provided by [Momentous Institute]." Additionally, Pinny stated on direct examination as follows:

Q. And on September 27 of 2007 will you read what [Mother] said about [S.C.]?

A. [Mother] alerted me to the possibility that [S.C.] may not be able to provide adequate care for her children were she, [Mother], to be in the hospital for more than a day or so.

Q. So from that—would it be fair to infer that [Mother] did not want her children to be with [S.C.] for whatever reason more than a day or two?

A. Correct.
. . . .
Q. And then there's a notation September 27th about what had actually occurred, read that?

A. [Mother] is at Green Oaks Hospital.

Q. So she came there to ask you-all to help her get to Green Oaks and you-all were successful in helping her; is that correct?

A. Correct.

Q. On October 18 of 2007 regarding [Mother], will you read what you wrote?

A. Discussed that she had told me she was concerned about her children being with [S.C.] and we agreed I'd give CPS a call. She was aware that CPS might blame her if her children were bruised if [S.C.] was too harsh with discipline.

Q. So she clearly there is talking with you and telling you that [S.C.] harshly disciplines the children?

A. Yes. I do remember that she was quite worried about that.

Further, on cross-examination by the children's attorney ad litem, Pinny testified as follows:

A. I guess the simple answer is there was at least one time when [Mother] did place the children with [S.C.] absent any kind of CPS involvement.

Q. That's what I'm referencing.

A. Yeah.

–4–

Q. But [Mother] was afraid her children would be bruised by [S.C.]?

A. Correct.

Q. So [Mother] knew [S.C.] would hurt her children?

A. Yes.

Q. But [Mother] left her kids with somebody who she knew would hurt them, right?

A. Yes.
. . . .
Q. Okay. In your treatment of [Mother], you noticed some narcissistic tendencies, would that be true?

 A. Yes.
. . . .
Q. Okay. So when she is sort of in that, and I'll just call it a narcissistic state, she puts herself before her children, correct?

A. Yes.

Q. Okay. That's a dangerous position for [Mother] to be in when she has two children that are special needs, would that be true?

A. Yes.

Q. It's dangerous for these children to be around a person in a narcissistic state, correct?

A. Correct.
. . . .
Q. Okay. [Mother], even during the time she was seeing you, was not medically compliant, is that correct?

A. Correct.

Q. All right. That was her choice in your—Would that be—In your opinion, was that the mother's choice to be not medically compliant?

A. Yes.

Q. Okay. Because the mother could be medically compliant if she choose [sic] to, because many time she choose [sic] to, correct?

A. Correct.

Q. The mother used illegal drugs to medicate herself; is that correct?

A. Yes.

Q. That was a voluntary choice to medicate herself with illegal drugs, correct?

A. Correct.
. . . .
Q. [Mother] should not be raising these children, is that true?

A. Yes.

On cross-examination by counsel for Mother, Pinny testified that throughout the time Mother was receiving services from Momentous Institute, she "was working towards self improvement and getting her children to the best position they could be in." Further, he testified Mother told him in December 2008 that she slept on the living room floor to "insure that her child does not unlock [the] front door and walk out" during the night.

Amy Schick testified she works as a therapist at a residential treatment center where N.T. currently resides. Schick stated she was N.T.'s counselor during September 2014 and met with her approximately eight times. According to Schick, N.T. has been diagnosed with posttraumatic stress disorder, "ADHD," a learning disorder, and "borderline intellectual functioning." Also, Schick testified N.T. told her she was raped when she was "about five." Schick stated N.T. is "very aggressive, emotional, depressed" and requires ongoing therapy. Further, Schick testified (1) during 2014, N.T. attempted to injure a teacher and another worker at the facility; (2) N.T. is "dangerous" and "in need of constant supervision" in order to prevent her from harming herself or others; and (3) "it could be problematic for [N.T.] to visit with her mother." Medical records of N.T. were introduced and admitted into evidence.

Shari Sawyer testified she is a licensed professional counselor at N.T.'s current residential treatment center. She has been N.T.'s therapist since October 2014 and meets with N.T. two to three times a week. According to Sawyer, N.T. "has been determined to be at an

intense level of supervision" and "in order for her to be safe, she requires constant supervision and at no time should she be left alone in order to protect [her] from herself and to protect others from her." Sawyer stated N.T. "doesn't observe boundaries," "won't follow direction or redirection," has a "difficult time" at school because "[s]he either wants to hit the teacher or run away from the teacher," and is currently not "doing well." Additionally, Sawyer testified (1) at the residential treatment center, N.T. receives ongoing therapy for the behaviors she is exhibiting; (2) the "treatment plan" for N.T. is for her to "process all of her trauma" through therapy, attend school, and remain in a "lock down" part of the facility for her safety; (3) without therapy three times a week, N.T.'s behaviors would probably "escalate"; and (4) "reintroducing [Mother] into [N.T.'s] life would not be in the best interest of the child" due to "unpredictability of [Mother's] illness." On cross-examination, Sawyer testified N.T. has indicated a desire "to see or stay with" her mother.

Daniella Rigueria testified she is the treatment director at the residential treatment facility where M.T. has resided since February 2014. She stated M.T. is not toilet trained and his speech development is equivalent to that of a one-year-old child. According to Rigueria, M.T. is autistic and has "rumination disorder," which she described as follows: "after you eat, you vomit your food" and "it comes back up" and "then you swallow it." The residential treatment facility provides M.T. with "frequent one on one" staffing, "24 hour" supervision, occupational speech therapy, and "sensory input" therapy. Also, M.T. takes numerous medications, including Risperdal for "movability and aggression," Vyvanse for "ADHD," Cetirizine for allergies, Trazodone and Clonodine for sleep, and Nexium for acid reduction. Rigueria stated that during January 2015, M.T. had thirty incidents of physical aggression, including hitting and biting others. Additionally, she stated M.T. has trouble sleeping and sometimes remains awake all night. She testified M.T. has made some progress since arriving at the facility and she believes

he can continue to improve "given the right services and structure and consistency." She does not believe it is "realistic" that M.T. would ever be able to live in a foster home, unless it were a "specialized one" with caregivers trained in "dealing with autism." She believes it would be in M.T.'s best interest to remain at a facility where he has a "constant routine schedule" and twenty-four-hour supervision. Medical records of M.T. were introduced and admitted into evidence.

Chad Starrah testified he is a supervisor at the residential treatment facility where M.T. currently resides. According to Starrah, M.T. requires supervision "every minute" and is a danger to himself without constant close supervision. On cross-examination, Starrah stated M.T. has made "a lot of progress with life skills and academic skills" over the past six months.

Dr. Matthew Cox testified he examined M.T. on March 27, 2012, at Reach Clinic at Children's Medical Center. Cox testified M.T. was brought in by the Department with multiple bruises and scars and symptoms of exceptionally poor caloric intake. Cox was told that M.T. had been removed from the home of his aunt, S.C. Photographs and medical records of M.T. pertaining to his treatment by Cox were introduced into evidence and published for the jury. Cox stated that he saw M.T. at a follow-up appointment approximately three weeks later. According to Cox, M.T. had gained "about seven pounds" and his skin injuries had healed.

Joan Brackins testified she is employed by the Association of Persons Affected by Addiction ("APAA"), which is a "peer to peer organization" that employs individuals who have overcome drug addiction or mental health issues to serve as "recovery coaches" for others. According to Brackins, APAA is "not a treatment center," but rather is "an empowerment center." Brackins stated she has been Mother's "recovery coach" since November 2013. She testified Mother had "a lot of issues" at first, but has been "going strong" since last year and is "keeping her meetings," attending medical appointments at "Metrocare" and "Baylor," and

"taking care of her financial status." Also, Brackins stated Mother was "in need of housing" when she started with APAA, but now has her own apartment. Brackins stated she believes Mother could take care of N.T. and M.T. because "she loves her children" and "talks about them all the time." Brackins testified Mother never told her M.T. is autistic and N.T. has mental health issues. However, she stated she is sure Mother can take care of the children's special needs because Mother "would have the good sense to get some help" and is able to "access services to assist her."

On cross-examination, Brackins testified that prior to obtaining an apartment in November 2014, Mother was living in shelters and with various family members. Additionally, the children's attorney ad litem introduced into evidence medical records of Mother dated April 22, 2014, that stated Mother had missed a medical appointment with Metrocare Services, was "off medication," and was experiencing "increased depression and sadness." In response to questions from the attorney ad litem, Brackins testified that "according to your paperwork," Mother was not honest with her regarding her medical compliance. Also, Brackins testified she was aware of the June 11, 2014 incident described above in which Mother was taken into police custody and admitted to Green Oaks Hospital. Brackins stated Mother told her she was having problems with family members at that time, "had ran out of her medication," and "could not get a doctor's appointment," so "she did what she did to go to Green Oaks so that she could get somebody to give her some medication."

Jim Turnage testified he is the president and owner of Forensic DNA and Drug Testing Services. He stated that according to drug tests performed by his facility, (1) a hair test on August 14, 2014, showed Mother tested positive for a "high level" of cocaine; (2) on December 2, 2014, toenail testing showed Mother tested positive for marijuana; (3) a hair test on February 27, 2013, showed Mother tested positive for a "medium level" of cocaine; and (4) a hair test on

November 23, 2012, showed Mother tested positive for cocaine and marijuana. Turnage testified hair and toenail testing can "go back" as far as twelve months prior to the date the sample is collected.

On cross-examination by Mother's counsel, Turnage was shown a drug test report from Elite Clinical Laboratory, Inc., a facility not owned by him. Turnage testified the report stated that a urine test on April 30, 2013, showed Mother tested negative for nine drugs, including marijuana and cocaine. According to Turnage, a urine test can "go back" up to thirty days for marijuana and up to three days for the other drugs listed in that report.

Veronica Willis testified she is employed by the Department and is the "ongoing caseworker for this case." The Department introduced medical records of Mother pertaining to several periods of hospitalization for mental health issues in 2009–2013. Willis testified as to the contents of those medical records respecting a hospitalization in 2012. Those records included notes by healthcare providers stating that Mother was paranoid and irritable, refused to take medications provided to her, and accused providers of "making up these diagnoses." Additionally, Willis testified, in part, as follows:

> Q. Does it concern the department that [Mother] has a history of realizing that she's having a mental breakdown, she seeks—appropriately she seeks care, in this particular situation she didn't, she had to be brought into protective custody but other times she seeks care, correct?
>
> A. Correct.
>
> Q. And then when they offer her care she refuses to accept the diagnosis and refuses the medication; is that a concern for the department?
>
> A. Yes.
>
> Q. Why does that concern the department?
>
> A. Because that state that [sic] she's unstable in her mental state.
>
> Q. And if the children were with her, in her care, what difference would that make if any?

A. The difference would be—the children—the children would be at danger. Their physical and emotional well being is at risk.

Willis testified that after the Department began its investigation in 2009, Mother gave the Department S.C.'s name as a possible placement for the children. Willis stated that Mother did not tell the Department she had ever had concerns in the past that S.C. might physically spank the children and leave bruises on them. Willis stated that when the children were removed from S.C. in 2012, there was "a possibility that the children might be able to be reunited with [Mother]." At that time, the Department offered Mother services that included "parenting, psychological evaluation, drug and alcohol assessment, drug and alcohol treatment, psychiatric evaluation, [and] random drug testing." Willis stated Mother was offered drug treatment because she tested positive for illegal drugs in November 2012. According to Willis, (1) Mother completed some of the services, but did not complete drug and alcohol assessment, drug and alcohol treatment, and individual counseling, and (2) in a supervised setting in 2012, Mother was observed being "aggressive" toward M.T. and "aggressive and rough" with N.T. Further, Willis testified as follows:

Q. Is it true that [Mother] hasn't progressed sufficiently to have custody and possession of her children since 2009?

A. Correct.

Q. If the mother had stopped using cocaine, if the mother had been medically compliant for years, don't you think that CPS would be encouraged to reconsider the mother as a permanent placement for this child?

A. Yes.

Q. But instead the mother has chosen to use cocaine and has chosen to be medically non-compliant; isn't that true?

A. Correct.

Q. Okay. And do you believe that the children would be in harm's way if they are presented back to their mother and put in their mother's custody?

–11–

A. At this time, yes.

Willis testified the Department's "long-term plan" for the children is to ensure that they have stable housing and are "taken care of," that their medical and physical needs are met, and that they are "provided with the best that they are able to be provided with."

On cross-examination, Willis testified (1) after the 2013 termination of Mother's parental rights was reversed by this Court as described above, Mother did not receive a copy of her service plan until November 2014; (2) it is not "the norm" for a parent to be able to complete a service plan in the amount of time from November 2014 to February 2015; (3) the "services" provided to Mother by APAA are "not services that the department recognizes"; (4) it has been more than a year and one-half since Mother has seen the children; and (5) N.T. "continue[s] to indicate that she would like to live primarily with [Mother]."

Mary Smith testified she is a licensed professional counselor at Metrocare Services, a Dallas County mental health facility. She stated she has worked as Mother's counselor since June 2013 and last saw Mother in January 2015. Smith stated Mother also has "a prescriber" at Metrocare for "her mental health medications." Smith stated Mother has been compliant with her therapy schedule "in some capacity" but does not attend therapy as often as Smith "would like." Smith testified the "current treatment plan" is for Mother to continue to have at least two "visits" per month with Smith.[6]

In the charge of the court, the jury was instructed that for the parent-child relationship to be terminated in this case, it must be proven by "clear and convincing evidence" that the parent has committed at least one of the following: (1) "[k]nowingly placed or knowingly allowed the

_____

[6] Additionally, the entire trial record from the March 2013 bench trial described above was introduced into evidence at the February 2015 trial. That 2013 record included testimony substantially similar to that described above and also contained testimony respecting a 1987 termination of Mother's parental rights as to another daughter, who tested positive for cocaine at birth. This opinion does not describe that evidence in detail. *See* TEX. R. APP. P. 47.1 (court of appeals must hand down written opinion that is as brief as practicable). However, all of the evidence in the record was reviewed and considered in deciding this appeal.

children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children"; (2) "[e]ngaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children"; or (3) "[u]sed a controlled substance, in a manner that endangered the health or safety of the children" and "failed to complete a court ordered substance abuse treatment program" or "after completion of a court ordered substance abuse treatment program continued to abuse a controlled substance." Further, the jury was instructed that in order to terminate Mother's parental rights, "it must also be proved by clear and convincing evidence that termination of the parent-child relationship would be in the best interests of the children."

Additionally, the charge of the court stated in part as follows: (1) "a fact may be established by direct evidence or by circumstantial evidence or by both"; (2) "[a] fact is established by direct evidence when proved by witnesses who saw the act done or heard the words spoken or by documentary evidence"; and (3) "[a] fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved."

The jury found that Mother's parental rights as to both children should be terminated. Based on the jury verdict, the trial court found in the decree described above that Mother committed the three acts described in the charge of the court and termination of Mother's parental rights is in the best interest of the children. Additionally, the trial court stated that the best interest of the children "will be served by appointing [the Department] as Permanent Managing Conservator" and ordered the Department appointed as such. This appeal timely followed.[7]

---

[7] This is an accelerated appeal pursuant to Texas Rule of Appellate Procedure 28.4(a). *See* TEX. R. APP. P. 28.4(a); *see also* TEX. FAM. CODE ANN. § 263.405 (West 2014). Further, the rules of judicial administration require disposition of appeals from judgments terminating parental rights, so far as reasonably possible, within 180 days of the date the notice of appeal is filed. *See* TEX. R. JUD. ADMIN. 6.2(a), available at http://www.supreme.courts.state.tx.us /MiscDocket/12/12903200.pdf.

## II. TERMINATION OF MOTHER'S PARENTAL RIGHTS

### A. Standard of Review

Because termination of parental rights is complete, final, and irrevocable, the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights. *See, e.g.*, *In re A.B.*, 437 S.W.3d 498, 502–03 (Tex. 2014); *In re J.D.B.*, 435 S.W.3d 452, 462 (Tex. App.—Dallas 2014, no pet.). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014).

On appeal, we apply a standard of review that reflects the elevated burden at trial. *In re J.D.B.*, 435 S.W.3d at 462 (citing *In re A.B.*, 437 S.W.3d at 502–03; *In re A.T.*, 406 S.W.3d 365, 370 (Tex. App.—Dallas 2013, pet. denied)); *In re A.E.*, No. 05-14-01340-CV, 2015 WL 1184179, at *5 (Tex. App.—Dallas Mar. 16, 2015, pet. denied) (mem. op.). This means both legal and factual sufficiency review of a decree terminating parental rights require a reviewing court to consider all the evidence to determine whether the fact-finder could reasonably form a firm belief or conviction that the grounds for termination are proven. *In re J.D.B.*, 435 S.W.3d at 462 (citing *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002)). Further, under both the legal and factual sufficiency standards, the appellate court must defer to the fact-finder's determinations as to witness credibility. *In re A.E.*, 2015 WL 1184179, at *5.

In evaluating the evidence for legal sufficiency in a termination case, we view the evidence in the light most favorable to the finding. *In re J.D.B.*, 435 S.W.3d at 462; *In re T.A.D.*, 397 S.W.3d 835, 839 (Tex. App.—Dallas 2013, no pet.). We "consider all the evidence, not just that which favors the verdict," and we assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. *In re J.D.B.*, 435 S.W.3d at 462–63 (citing *In*

*re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005)). We disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *Id*. at 463; *see In re K.M.L.*, 443 S.W.3d 101, 116 (Tex. 2014).

When reviewing the factual sufficiency of the evidence supporting a termination finding, an appellate court asks whether, in light of the entire record, the evidence is such that a fact-finder could reasonably form a firm conviction about the truth of the State's allegations. *In re A.E.*, 2015 WL 1184179, at *5. Further, the appellate court must consider whether the disputed evidence is such that a reasonable fact-finder could not have reconciled that disputed evidence in favor of its finding. *In re J.D.B*., 435 S.W.3d at 463. If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *See id*.; *In re A.E.*, 2015 WL 1184179, at *5.

### B. Applicable Law

A trial court may terminate the parent–child relationship if the fact-finder finds by clear and convincing evidence that (1) the parent committed one or more of the enumerated acts or omissions justifying termination under section 161.001(1) of the Texas Family Code and (2) termination of parental rights is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(1)–(2) (West 2014).[8] Both elements must be established, and each required finding must be based on clear and convincing evidence. *See, e.g.*, *In re J.D.B.*, 435 S.W.3d at 463. Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *Id*. (citing *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003)).

---

[8] Amended by Act of Mar. 30, 2015, 84th Leg., R.S., ch.1, § 1.078, 2015 Tex. Sess. Law Serv. 1, 18–20 (West) (to be codified at TEX. FAM. CODE ANN. § 161.001(b)) (eff. Apr. 2, 2015). We note that the recent amendment of section 161.001 does not affect our resolution of Mother's issues because provisions identical to the relevant provisions of the former version appear in the current version. The only change respecting those provisions is to the subsection numbers. We cite the former statute in this opinion.

Pursuant to section 161.001(1), acts or omissions justifying termination of parental rights include, *inter alia*, (1) knowingly placing or knowingly allowing the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, *see* TEX. FAM. CODE ANN. § 161.001(1)(D) ("subsection (D)"); (2) engaging in conduct or knowingly placing the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, *see id*. § 161.001(1)(E) ("subsection (E)"); and (3) using a controlled substance in a manner that endangered the health or safety of the child and failing to complete a court-ordered substance abuse treatment program or, after completion of a court-ordered substance abuse treatment program, continuing to abuse a controlled substance, *see id*. § 161.001(1)(P) ("subsection (P)").

"Endanger" means to expose to loss or injury or jeopardize a child's emotional or physical health. *In re J.D.B.*, 435 S.W.3d at 463. It is not necessary that the conduct be directed at the child or that the child actually suffer an injury. *Id*. The primary distinction between subsections (D) and (E) is the source of the physical or emotional endangerment to the child. *Id*. Subsection (D) addresses the child's surroundings and environment, while subsection (E) specifically addresses parental conduct. *Id*. However, conduct of the parent or another can be relevant to the child's environment under subsection (D). *Id*. That is, "[c]onduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D)." *Id*. at 464 (quoting *Castaneda v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 509, 522 (Tex. App.—El Paso 2004, pet. denied)). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home is part of the 'conditions or surroundings' of the child's home under subsection (D)." *Id*. (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)

("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards.")).

"A strong presumption exists that the best interest of the child is served by keeping the child with his or her natural parent." *In re A.E.*, 2015 WL 1184179, at *5 (citing *In re E.A.F.*, 424 S.W.3d 742, 750 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)). Factors that may be considered in determining whether termination of parental rights is in a child's best interest include (1) the child's desires; (2) the child's age and emotional and physical needs now and in the future; (3) any emotional and physical danger to the child now and in the future; (4) the parenting abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the best interests of the children; (6) the plans for the children by the individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent–child relationship is not a proper one; and (9) any excuse for the acts or omissions of a parent. *In re R.F.*, 115 S.W.3d 804, 811 (Tex. App.—Dallas 2003, no pet.); *see In re A.E.*, 2015 WL 1184179, at *5–6; *see also Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). "These factors are not exhaustive, and the absence of some of these factors does not preclude a best interest finding, particularly if undisputed evidence shows the parental relationship endangered the child's safety." *In re A.E.*, 2015 WL 1184179, at *6 (citing *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)).

### C. Application of Law to Facts

#### 1. Subsection (D)

In Mother's first issue, she challenges the legal and factual sufficiency of the evidence to support a jury finding that she committed the act described in subsection (D), i.e., that she "knowingly placed or knowingly allowed the children to remain in conditions or surroundings

which endanger the physical or emotional well-being of the children." *See* TEX. FAM. CODE ANN. § 161.001(1)(D). Mother contends in part,

> The state argues that mother knew [S.C.] was an inappropriate caregiver for the children. However, no evidence is presented that mother actually knew that [S.C.] would abuse the children. No evidence is given for why mother could have not wanted to leave her children with [S.C.] years ago. There are many reasons why mother could have held that opinion. There is no testimony that mother's reason for not liking [S.C.] was a knowledge that [S.C.] would abuse M.T.

Additionally, Mother asserts (1) "the evidence shows that the state completed a full independent investigation into [S.C.] and concluded she was an appropriate caregiver" and (2) "[w]hen the department approved of the placement with [S.C.], the evidence is not clear and convincing of mother's endangerment of the children."

The record shows Pinny testified "there was at least one time when [Mother] did place the children with [S.C.] absent any kind of CPS involvement." Specifically, Pinny described an instance in October 2007 when Mother was afraid the children would be bruised by S.C., but nevertheless left the children with S.C. The record does not show the Department was aware of or approved of Mother leaving the children with S.C. at that time. On this record, we conclude the evidence is both legally and factually sufficient to support a finding by clear and convincing evidence that Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children. *See id.*; *In re J.D.B.*, 435 S.W.3d at 463–64.

We decide against Mother on her first issue.

### 2. Best Interest

Next, we consider Mother's fourth issue, in which she contends the evidence is legally and factually insufficient to support a finding that termination of her parental rights is in the children's best interest. According to Mother, "[a]lthough a parent's behavior may reasonably

suggest that a child would be better off with a new family, the best interest standard does not permit termination merely because a child might be better off living elsewhere." Further, Mother asserts (1) even if N.T. will continue to require a high level of care in a treatment center, the record shows "N.T.'s desire to continue a relationship with her mother"; (2) M.T. "is old enough to have developed a relationship with his mother that needs to continue"; and (3) the evidence shows Mother "is able to find care for them and programs to assist her in finding care for the children." Additionally, Mother contends, in part,

> If these children are going to be living in residential treatment centers where multiple caregivers are needed at all hours, it is in the children's best interest for mother to retain her rights so the mother can have visitation and access, and the children can continue a relationship and know their mother.
> The department cannot guarantee these children will be adopted; the only permanency plan in place is for the children to remain at high level of care facilities. A relationship with [Mother] will foster a familial culture for the children and allow them to continue the relationships with all of their relatives.

The Texas Supreme Court has stated that "[e]vidence about placement plans and adoption are, of course, relevant to best interest." *In re C.H.*, 89 S.W.3d at 28. However, according to that court, "the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located." *Id*. "Instead, the inquiry is whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest—even if the agency is unable to identify with precision the child's future home environment." *Id*.; *accord In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).

In the case before us, N.T.'s expressed desire to live primarily with Mother is a factor to be considered in this Court's best-interest analysis. *See In re R.F.*, 115 S.W.3d at 811. However, among the other factors to be considered are the children's needs now and in the future, any emotional and physical danger to the children now and in the future, the parenting

–19–

abilities of the individual seeking custody, the stability of the home, and acts or omissions of the parent which may indicate that the existing parent–child relationship is not a proper one. *See id.* The record shows Mother has used illegal drugs in the past and was still doing so at least as late as December 2013. Although she is currently meeting with a peer "recovery coach" at APAA, Brackins testified that organization is "not a treatment center." The record does not show Mother is otherwise undergoing any drug treatment. *See In re A.L.W.*, No. 01-14-00805-CV, 2015 WL 4262754, at \*12 (Tex. App.—Houston [1st Dist.] July 14, 2015, no pet. h.) (mem. op.) ("Parental drug abuse reflects poor judgment and may be a factor to be considered in determining a child's best interest."); *see also* TEX. FAM. CODE ANN. § 263.307(b)(8) (West 2014)[9] (stating courts may consider whether there is history of substance abuse by child's family in determining whether child's parents are willing and able to provide child with safe environment). Additionally, while Mother has sought help for mental health issues, the record demonstrates (1) she was not truthful with Brackins about her lack of compliance respecting her mental health treatment and (2) her inability to remain medically compliant with respect to her mental health is inconsistent with being able to provide a safe and stable environment for the children. *See In re L.L.F.*, No. 02-11-00485-CV, 2012 WL 2923291, at \*16–17 (Tex. App.— Fort Worth July 19, 2012, no pet.) (mem. op.) (considering parent's failure to take prescribed medication for bipolar disorder as factor in determining whether termination was in best interest of child). Further, (1) despite at least some awareness of her children's considerable special needs and the level of care they require, Mother was observed being "aggressive" toward M.T. and "aggressive and rough" with N.T. in a supervised setting in 2012, and (2) although the

---

[9] Amended by Act of March 30, 2015, 84th Leg., R.S., S.B. 219, § 1.181 (to be codified as an amendment to TEX. FAM. CODE ANN. § 263.307) (eff. Apr. 2, 2015). The recent revisions to family code section 263.307 did not change the statutory language of former section 263.307(b)(8) or affect the numbering of that statutory provision. We cite the former version of the statute.

record shows Mother was living in an apartment at the time of the 2015 trial, she had been staying in shelters and with relatives prior to that time.

To the extent Mother's argument can be construed to contend the record shows she has improved her situation during the year preceding trial, "recent improvement alone is not sufficient to avoid termination of parental rights." *In re K.D.C.*, No. 02-12-00092-CV, 2013 WL 5781474, at *16 (Tex. App.—Fort Worth Oct. 24, 2013, no pet.) (mem. op.); *see also In re J.O.A.*, 283 S.W.3d 336, 346–47 (Tex. 2009) ("evidence of improved conduct, especially of short duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices"). On this record, viewing the evidence in the light most favorable to the verdict, we conclude the evidence is such that the fact-finder could reasonably form a firm belief or conviction that termination of Mother's parental rights is in the children's best interest. *See In re J.P.B.*, 180 S.W.3d at 573. Additionally, viewing the evidence in a neutral light, we conclude the fact-finder could reasonably form a firm belief or conviction that termination is in the children's best interest. *See In re J.D.B.*, 435 S.W.3d at 463. Therefore, we conclude the evidence is legally and factually sufficient to support the jury's finding that termination of Mother's parental rights is in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(2). We decide Mother's fourth issue against her.

Further, as described above, Mother's second and third issues challenge the sufficiency of the evidence to support predicate findings respecting subsections (E) and (P). *See id*. § 161.001(1)(E) & (P). Because we concluded above that the evidence is legally and factually sufficient to support a finding respecting subsection (D) and a finding that termination of Mother's parental rights is in the children's best interest pursuant to section 161.001(2), we need not address Mother's second and third issues. *See id.* § 161.001(1)–(2); *In re A.V.*, 113 S.W.3d

–21–

at 362 (only one predicate finding under subsection 161.001(1) is necessary to support judgment of termination when there is also finding that termination is in child's best interest).

## III. APPOINTMENT OF DEPARTMENT AS MANAGING CONSERVATOR

### A. Standard of Review

The quantum of proof required to support a conservatorship appointment differs from the level necessary to support a termination decision. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Specifically, conservatorship determinations are subject to review for abuse of discretion. *Id*. Therefore, we reverse the trial court's appointment of a managing conservator only if we determine it was arbitrary or unreasonable. *Id*.

### B. Applicable Law

Texas Family Code section 161.207(a) provides in part that if the court terminates the parent–child relationship with respect to both parents or to the only living parent, the court shall appoint "a suitable, competent adult," the Department, or a licensed child-placing agency as managing conservator of the child. TEX. FAM. CODE ANN. § 161.207(a) (West 2014).[10] Further, an order terminating the parent–child relationship generally "divests the parent and the child of all legal rights and duties with respect to each other, except that the child retains the right to inherit from and through the parent unless the court otherwise provides." *Id*. § 161.206(b) (West 2014).

### C. Application of Law to Facts

In her fifth issue, Mother contends the evidence is legally and factually insufficient to support the appointment of the Department as managing conservator of the children. According to Mother, Texas Family Code section 153.131(a) creates "a rebuttable presumption that a parent

_____

[10] Amended by Act of March 30, 2015, 84th Leg., R.S., S.B. 219, § 1.088 (to be codified as an amendment to TEX. FAM. CODE ANN. § 161.207) (eff. Apr. 2, 2015). The recent revisions to section 161.207(a) do not change the provisions described above. We cite the former version of the statute in this opinion.

will be named a child's managing conservator, unless the court finds that such an appointment would not be in the child's best interest 'because the appointment would significantly impair the child's physical health or emotional development' or finds that there is a history of family violence involving the parents." *See id.* § 153.131(a) (West 2014).[11] Additionally, Mother argues (1) "Mother has an apartment and the children are ready to return home to their mother"; (2) "if the children's needs are such to where they will live in a treatment center with a high level of care, there is no reason why the department needs to be managing conservator and make the decision about where the children live"; and (3) "Mother is fully capable of finding a treatment center for the children and providing for their care." Thus, Mother contends, "the preponderance of the evidence proved appointment of Mother as managing conservator would not significantly impair the children's physical health or emotional development" and "the trial court's order appointing [the Department] as the managing conservator was an abuse of discretion."

The Fourteenth Court of Appeals in Houston recently rejected a similar argument in a parental termination case and stated as follows:

> In cases where a trial court's termination of the parent-child relationship is reversed, a parent is required to independently challenge a trial court's finding under section 153.131(a) to obtain reversal of the conservatorship appointment. *See In re J.A.J.*, 243 S.W.3d at 616–17; *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). In this case, however, we have overruled appellant's challenge to the termination, and the trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination pursuant to Family Code section 161.207." *In re A.S.*, 261 S.W.3d at 92. . . . Appellant provides no authority for the proposition that she is a "suitable, competent adult" as contemplated by section 161.207(a) or that the presumption in section 153.131(a) applies to a parent whose parental rights have been terminated under Chapter 161. *See In re A.W.B.*, No. 14-11-00926-CV, 2012 WL 1048640, at *7 (Tex. App.—Houston [14th Dist.] Mar. 27, 2012, no pet.) (mem. op.). Rather, when a trial court terminates the parent-child relationship, the court also "divests the parent and the child of all legal rights and duties with respect to each other." TEX. FAM. CODE ANN. § 161.206 (West 2008);

---

[11] Subsection (a) of section 153.131 states in part "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child." *Id.*

> *In re A.W.B.*, 2012 WL 1048640, at \*7. Accordingly, appellant's challenge to the trial court's appointment of the Department as sole managing conservator, rather than appellant, is without merit.

*In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at \*12 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.).

We agree with the Fourteenth Court of Appeals' reasoning in *In re J.R.W. See id.* In the case before us, "we have overruled appellant's challenge to the termination, and the trial court's appointment of the Department as sole managing conservator may be considered a 'consequence of the termination pursuant to Family Code section 161.207.'" *Id.* (quoting *In re A.S.*, 261 S.W.3d at 92). Further, Mother "provides no authority for the proposition that she is a 'suitable, competent adult' as contemplated by section 161.207(a) or that the presumption in section 153.131(a) applies to a parent whose parental rights have been terminated under Chapter 161." *Id.* Accordingly, Mother's challenge to the trial court's appointment of the Department as sole managing conservator, rather than Mother, "is without merit." *Id.*; *accord In re I.R.K.-N*, No. 10-13-00455-CV, 2014 WL 2069281, at \*9 (Tex. App.—Waco May 15, 2014, pet. denied) (mem. op.); *see also In re S.R.*, 452 S.W.3d 351, 359 n.3 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("A trial court does not abuse its discretion in appointing the Department as conservator of the children where the evidence is sufficient to support termination of parental rights.") (citing *In re C.N.S.*, No. 14-14-00301-CV, 2014 WL 3887722, at \*13 (Tex. App.—Houston [14th Dist.] Aug. 7, 2014, no pet.) (mem. op.)).

We decide against Mother on her fifth issue.

## IV. CONCLUSION

We decide Mother's first, fourth, and fifth issues against her. We need not reach Mother's second and third issues.

The trial court's judgment is affirmed.


150343F.P05

<u>/ Douglas S. Lang/</u>
DOUGLAS S. LANG
JUSTICE

# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF N.T., A CHILD

No. 05-15-00343-CV

On Appeal from the 256th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-04-10316-Z.
Opinion delivered by Justice Lang, Justices Stoddart and Schenck participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 2nd day of September, 2015.



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

IN THE INTEREST OF M.T., A CHILD

No. 05-15-00838-CV

On Appeal from the 302nd Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-06-08087-U.
Opinion delivered by Justice Lang, Justices Stoddart and Schenck participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 2nd day of September, 2015.