**AFFIRM and Opinion Filed March 3, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-01082-CV

## IN THE INTEREST OF X.A.S., A CHILD, Appellant

**On Appeal from the 196th Judicial District Court**
**Hunt County, Texas**
**Trial Court Cause No. 86621**

## MEMORANDUM OPINION

Before Chief Justice Burns, Justice Whitehill, and Justice Molberg
Opinion by Chief Justice Burns

Mother appeals the trial court's order terminating her parental rights to her son, X.A.S. In her sole issue, Mother argues the evidence is legally and factually insufficient to support termination of her parental rights under family code section 161.001(b)(1)(N), constructive abandonment. For the reasons that follow, we affirm the trial court's judgment.

### Factual and Procedural Background

X.A.S. was born August 10, 2018. That same day, the Texas Department of Family and Protective Services (the "Department") received a referral from the hospital alleging neglectful supervision of X.A.S. based on Mother's past history with the Department. Three times prior to X.A.S.'s birth, the Department removed

other children from Mother's care and became the temporary managing conservator. In these instances, Mother failed to provide each with proper nutrition—feeding one of them "only once or one and a half times a day"—kept them in "extremely unsanitary" conditions—in which one of them got a diaper rash the equivalent of a second degree burn—tested positive for methamphetamines during one of their births, and failed to generally provide for the children's basic needs.

In this case, as alleged in the Department's affidavit in support of removal, X.A.S. weighed 5 pounds and 14 ounces at birth. At X.A.S.'s check-up eight days after his birth, his pediatrician informed Mother that X.A.S. had lost weight. The pediatrician advised Mother that because she did not produce enough milk, she should breastfeed every two hours and supplement with infant formula if X.A.S. was still hungry.

The pediatrician's notes showed that on September 17, 2018, the pediatrician diagnosed X.A.S. with "failure to thrive" and instructed Mother to take X.A.S. directly to the neonatal intensive care unit ("NICU"). The notes stated that Mother was very angry, yelling that she needed to run errands before going to the NICU. The pediatrician immediately contacted the NICU doctor, advising that if Mother did not show up within a reasonable time, to call the Department or the police if necessary.

In the affidavit in support of removal, CPS Investigator, Kevin Wolfe, explained that he went to the NICU, where X.A.S. had been admitted the day before.

A nurse told Wolfe that Mother claimed she was breastfeeding and supplementing with infant formula, but because X.A.S. was extremely malnourished, the nurse believed it was more than likely Mother was not supplementing with formula as she claimed. The nurse further informed Wolfe that X.A.S. had gained weight since being admitted into the NICU just the day before, and that she did not believe there was a medical reason for X.A.S.'s weight loss.

In a letter to the Department, the NICU doctor stated that Mother did not grasp the seriousness of X.A.S.'s situation. Mother wanted to breastfeed exclusively, but she was not producing enough milk. Mother repeatedly voiced her opinion to the hospital staff that they were "over-feeding" X.A.S., and this concerned the doctor as he did not believe Mother would feed X.A.S. appropriately at home due to her failure to accept medical advice. In his letter, the doctor further cautioned that X.A.S.'s condition could impact his brain development.

Based on these facts, on September 27, 2018, the Department filed its petition to terminate Mother's parental rights, and the trial court appointed the Department as X.A.S.'s temporary sole managing conservator. Because of Mother's alleged failure to maintain significant contact with X.A.S. while he was in the Department's care, the Department later sought termination under family code section 161.001(b)(1)(N) for constructive abandonment. On September 4, 2019, the case proceeded to a bench trial. After hearing all the evidence, the trial court terminated Mother's parental rights under section 161.001(b)(1)(N) and appointed the

Department as X.A.S.'s permanent managing conservator. Mother appeals the trial court's judgment.

**Sufficiency of the Evidence**

"Texas Family Code section 161.001(b) allows for involuntary termination of parental rights if clear and convincing evidence supports that a parent engaged in one or more of the twenty-one enumerated grounds for termination and that termination is in the best interest of the child." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); TEX. FAM. CODE § 161.001(b)(1)(A)–(U), (b)(2). Here, in addition to finding that Mother constructively abandoned X.A.S. under section 161.001(b)(1)(N), the trial court also found that termination was in X.A.S.'s best interest. In her only issue, Mother challenges the legal and factual sufficiency of the evidence supporting the statutory ground for termination. Mother does not challenge the trial court's best interest finding.

**I. Standard of Review**

Because the natural right existing between parents and their children is of constitutional dimensions, we strictly scrutinize involuntary parental termination. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000); *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985). In parental termination cases, due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE § 161.001(b); *see N.G.*, 577 S.W.3d at 235. As defined by the family code, "clear and convincing" evidence is that "measure or degree of proof that will produce in the mind of the trier

of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *N.G.*, 577 S.W.3d at 235.

On appeal, we apply a standard of review that reflects the elevated burden at trial. *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.). This means that under both legal and factual sufficiency standards, we are required to consider all the evidence to determine whether the factfinder could reasonably form a firm belief or conviction that the grounds for termination are proven. *Id*. Further, under both standards, we must defer to the factfinder's determinations as to witness credibility. *Id*.

When reviewing for legal sufficiency in a termination case, we view the evidence in the light most favorable to the finding. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam). We "consider all the evidence, not just that which favors the verdict," and we assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id*. We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id*.

When reviewing for factual sufficiency in a termination case, we ask whether, in light of the entire record, the evidence is such that a factfinder could reasonably form a firm conviction about the truth of the allegations. *N.T.*, 474 S.W.3d at 475. Further, we must consider whether the disputed evidence is such that a reasonable factfinder could not have reconciled that disputed evidence in favor of its finding. *Id*. If the disputed evidence is so significant that a factfinder could not have

–5–

reasonably formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

## II. Applicable Law

A parent constructively abandons a child when the child has been in the permanent or temporary managing conservatorship of the State for at least six months and (1) the State has made reasonable efforts to return the child to the parent, (2) the parent has not regularly visited or maintained significant contact with the child, and (3) the parent has demonstrated an inability to provide the child with a safe environment. TEX. FAM. CODE § 161.001(b)(1)(N); *See In re K.A.H.*, 195 S.W.3d 840, 841–42 (Tex. App.—Dallas 2006, no pet.). An exception to the "reasonable efforts" prong exists if the trial court finds the parent subjected the child to "aggravated circumstances." TEX. FAM. CODE § 262.2015(a). The first element focuses on the Department's conduct; the second and third elements focus on the parent's conduct. Mother challenges only the first and second elements.

## III.       Application

### "Reasonable Efforts"

First, Mother challenges the sufficiency of the evidence supporting the trial court's finding that the Department made reasonable efforts to return X.A.S. to Mother. Mother complains that, despite the Department's claim that aggravated circumstances waived the requirements of a service plan and other reasonable

efforts, the Department did not offer any proof of an aggravated circumstances finding at trial and such finding is not supported by the record.

In determining whether sufficient evidence supports termination under section 161.001(b)(1)(N), "the question is whether the Department made reasonable efforts, not ideal efforts." *In re F.E.N.*, 542 S.W.3d 752, 766–67 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). Generally, the Department's implementation of a family service plan is considered a reasonable effort to return a child to the parent. *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.). A trial court, however, may waive the requirements of a service plan and other reasonable efforts if the court finds the parent subjected the child to "aggravated circumstances." TEX. FAM. CODE § 262.2015(a). A trial court can make such finding if "the parent's parental rights with regard to another child have been involuntarily terminated based on a finding that the parent's conduct violated section 161.001(b)(1)(D) or (E)" or "if the parent's parental rights with regard to another child of the parent have been involuntarily terminated." *Id.* at 262.2015(5), (7).

We begin by observing that although the Department did not plead aggravated circumstances in its original petition, its November 21, 2018 *Status Report* provided notice that "[t]he Department is seeking aggravated circumstances on [Mother] due to CPS involvement that led to termination of parental rights to two of her children." And following a November 30 adversary hearing, the trial court entered its December 7, 2018 *Temporary Order*, in which it expressly found aggravated

circumstances in X.A.S.'s case based on the involuntary termination of Mother's parental rights to two other children and, specifically, as to endangerment grounds to those children under sections 161.001(b)(1)(D) or (E). Moreover, at trial, Savannah Ulch, a Department caseworker, testified that Mother had two prior Department cases involving three other children which resulted in the termination of Mother's parental rights of two children, and a relative appointment as permanent managing conservator of the third child. Thus, the evidence is legally and factually sufficient to support an aggravated circumstances finding.

But even if the record did not disclose an aggravated circumstances finding, the evidence shows the Department made reasonable efforts to return X.A.S. to Mother. Mother did not appear for trial and never testified. Instead, at trial, Charlene Green, a Department caseworker,[1] testified at length about her communications with Mother. Green said she first met Mother on October 25, 2018 at Good Samaritan homeless shelter. Green explained that Nathaniel Newell, Mother's previous caseworker, helped Mother get into the shelter where she lived for about two or three weeks before being discharged. Green testified that Mother told Green and Newell that after she left the shelter, she began living at a church in McKinney. Mother also told Green that she sometimes lived in a car with a man and his six-year-old

---

[1] Initially, Green was the secondary caseworker and Nathaniel Newell was the primary caseworker. In December 2018, Green became the primary caseworker.

daughter. According to Green, Mother would not provide the name of the church or name the man.

Green testified that on October 25, 2018, she and Newell met with Mother to discuss Mother's goals for the case. When Mother expressed that she wanted to raise X.A.S. and continue breastfeeding, Newell and Green discussed with Mother the importance of supplementing breastfeeding with infant formula since her failure to do so caused X.A.S.'s failure to thrive diagnosis. Green then told Mother she "would be more than happy" to take Mother's breast milk to X.A.S. Mother gave Green a container of breast milk that same day.

Green further testified that Mother was doing "really well" at Good Samaritan. Mother was attending parenting classes and had also gotten a housekeeping job at a nearby hotel. At the end of the visit, Mother requested updates on X.A.S.'s weight. Green told Mother she would update her on X.A.S.'s health and progress.

According to Green, the Department generally communicated with Mother via text message. Green testified she and Mother texted back and forth a lot, discussing the possibility of setting up drug tests and getting resources. When Mother said she wanted to work services to fight for X.A.S., Green told Mother that she would find online parenting classes Mother could do at the library if Mother gave Green a "location of where she would be." Mother never gave Green this

information; Green said "[Mother] struggled with - - saying she had the time and ability to get somewhere."

Because Mother failed two drug tests, she was not allowed to stay at Good Samaritan. After leaving the shelter, Green testified Mother was laid off from her job. As Green explained, Mother's job was a "package deal" based on an agreement between the shelter and the hotel that people staying at the shelter could work at the hotel as long as they stayed clean and followed the rules.

Green further explained that Mother then applied for a job at Oncor, which required drug testing. Mother told Green she took the drug test, but did not tell Green the results. At the time, Green believed Mother was struggling with drug use, having twice tested positive for marijuana. As far as Green knew, Mother's only job during the case was at the hotel.

Green testified that on January 23, 2019, she asked Mother to take a drug test. When Green sent Mother the testing site's information, she also discussed with Mother various transportation options, including public transit. Although Mother did not submit to drug testing that day, Green explained that Mother drug tested on four other occasions when either Green or Mother's friend provided Mother with transportation. On two of those tests, Mother tested positive for marijuana.

At the end of January 2019, Green testified she started having problems communicating with Mother. Mother called Green from a friend's phone and told Green she lost her phone. Mother then gave Green an email address for further

communications. Green told Mother she would send her pictures of X.A.S. and any updates on a regular basis and asked that Mother email back or call whenever she could borrow a phone.

When Green went out on maternity leave in February 2019, Savannah Ulch took over the case. Ulch testified that she met Mother at a court hearing on February 19. Mother told Ulch she was not participating in services and, though Ulch knew this was an aggravated circumstances case, Ulch asked Mother if she needed help finding narcotics anonymous or alcoholics anonymous classes. According to Ulch, Mother "didn't need any help finding them," having told Ulch that she "knew where [the classes] were in her area." As far as Ulch knew, Mother never attended any classes.

At trial, Ulch further explained that during the time she was assigned to the case, she never knew where Mother lived. Mother told Ulch she lived in McKinney, but provided no specifics. On June 12, 2019, Ulch said she offered Mother a ride to a court hearing set for the next day. In doing so, Ulch again asked Mother where she lived. Mother replied that "her attorney knew," and did not tell Ulch. Mother did not take Ulch up on her offer and did not attend the hearing.

At the close of evidence, Mother's attorney moved for a directed verdict, arguing the Department failed to present any evidence that it made reasonable efforts to return X.A.S. to Mother. The trial court denied the motion, finding the Department did beyond what was reasonable in this case. We agree with the trial court.

The record shows the Department facilitated Mother's acceptance into Good Samaritan where Mother had a job and attended parenting classes; provided Mother with transportation to drug tests when Mother allowed it to; made efforts to help Mother with services; advised Mother on the importance of supplementing breastfeeding with infant formula; provided Mother with pictures of X.A.S. and regular updates on his health and progress; and took Mother's breast milk to X.A.S. at his foster home. Therefore, we conclude that even in the absence of an aggravated circumstances finding, the Department made reasonable efforts to return X.A.S. to Mother.

### "Regular Visits or Significant Contact"

Next, Mother challenges the trial court's finding that she did not regularly visit or maintain significant contact with X.A.S. Mother argues that she regularly attempted to visit and maintain significant contact with X.A.S., but the Department "unreasonably thwarted" those efforts because she "no-showed" to a drug test. Green testified the trial court had a standing order providing that Mother's visits would be suspended if she failed a drug test. Pursuant to the court's order, a "no-show" to a drug test was presumed a "dirty test." To regain visits, Mother had to pass two urine drug tests separated by a two-week time frame.

Though Mother contends in her briefing the Department failed to notify her of this policy, both Green and Ulch testified that they discussed it with Mother and repeatedly reminded Mother of what she needed to do to regain visits. Further,

Mother's attorney signed the *Temporary Order Following Adversary Hearing* which referenced, through attachments, Mother's *Visitation Plan* requiring that Mother "[m]ust pass two consecutive UA drug tests before visits may resume per standing court order."

Green testified Mother attended three visits with X.A.S. before her visits were suspended on November 7, 2018. To help Mother regain visits, Green scheduled drug tests on November 30, 2018, December 12, 2018, January 7, 2019, and January 23, 2019. Mother submitted to the first three tests—two of which Mother tested positive for marijuana—but she did not take the fourth. Having failed two drug tests and having "no-showed" to one test, the trial court suspended Mother's visits. Green testified that Mother did not have any more visits "due to her choices not to remain drug-free."

Green said she followed up with Mother on January 30, 2019 and again spoke to her about drug testing so she could regain visits. To accommodate Mother, Green asked Mother to let her know which days Mother might have transportation so Green could "do the best that [she] could" to work around that. Mother did not do so.

Ulch testified that, during the time she was assigned to the case, Mother did not have any visits with X.A.S. Ulch, however, did talk to Mother about visits and reminded her of the court's policy. On seven different days, Ulch asked Mother to take drug tests, but Mother did not test on any of the requested dates due to transportation issues. As to one proposed test date, Ulch testified Mother texted

asking if she could test that day because she had transportation. Ulch explained that when she accommodated Mother, Mother did not show up.

Although Mother argues the Department "unreasonably thwarted" her ability to visit X.A.S., the evidence shows that, to the contrary, submitting to drug testing to regain visits was within Mother's control. *See Quiroz v. Dep't of Family and Protective Servs.*, No. 01–08–00548–CV, 2009 WL 961935, at \*6–7 (Tex. App.— Houston [1st Dist.] April 9, 2009, no pet.) (mem. op.) (mother was not prevented from regularly visiting or maintaining significant contact with her child where mother only needed to have an order denying contact lifted to regain contact); *Nuyen v. Tex. Dep't of Family and Protective Servs.*, No. 03–12–00147–CV, 2012 WL 3629427, at \*6 (Tex. App.—Austin Aug. 23, 2012, no pet.) (mem. op.) (mother was not prevented from regularly visiting or maintaining significant contact with her child where contact could be regained if mother explained in court why she missed hearings to regain visits). Moreover, Green's and Ulch's testimony regarding the Department's efforts to assist Mother with scheduling and transportation to drug testing facilities refutes Mother's argument that the Department created an impossible or unreasonable condition for Mother to regain visits by sending Mother to testing facilities it "knew" she could not get to because of her indigence and lack of transportation. Further, we find no evidence that Mother ever requested a different testing location or ever requested transportation assistance.

We also disagree with Mother that *In re F.E.N.*, 542 S.W.3d 752 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) is analogous to this case. In that case, the trial court signed an order suspending the father's visits until he established paternity and provided a clean drug test. *Id.* at 759. The father complied with the court order, but the trial court did not reinstate his visits, even after the father requested the trial court to do so. *Id.* at 759, 763. Because the trial court prevented the father from regaining his visits, the Fourteenth Court of Appeals found that the father's time away from the child was not voluntary. *Id.* at 763.

Like the father in *F.E.N.* who was required to provide a clean drug test to regain visits, here, Mother could have regained visits if she passed two urine drug tests separated by a two-week time frame. The Department gave Mother numerous opportunities to demonstrate clean drug tests and, when possible, accommodated Mother's requested testing dates. But unlike the father in *F.E.N.* who complied with the court order, Mother did not show up for testing. Moreover, unlike the trial court in *F.E.N.* that prevented the father from regaining his visits, here, there is no evidence the trial court or the Department prevented Mother from regaining her visits with X.A.S. Therefore, based on this evidence, we conclude that Mother failed to regularly visit or maintain significant contact with X.A.S.

**CONCLUSION**

Based on our review of the record, we conclude the Department proved by clear and convincing evidence that (1) Mother subjected X.A.S. to aggravated

–15–

circumstances, (2) the Department made reasonable efforts to return X.A.S. to Mother, though not required to do so, and (3) Mother failed to regularly visit or maintain significant contact with X.A.S. Therefore, we conclude the evidence is legally and factually sufficient to support termination of Mother's parental rights under section 161.001(b)(1)(N). We overrule Mother's sole issue. We affirm the trial court's judgment.

/Robert D.Burns, III/
ROBERT D. BURNS, III
CHIEF JUSTICE

191082F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

**JUDGMENT**

IN THE INTEREST OF X.A.S., A CHILD

No. 05-19-01082-CV

On Appeal from the 196th Judicial District Court, Hunt County, Texas Trial Court Cause No. 86621. Opinion delivered by Chief Justice Burns. Justices Whitehill and Molberg participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee recover its costs of this appeal from appellant.

Judgment entered March 3, 2020