**Affirmed and Opinion Filed January 17, 2018**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

## No. 05-17-00846-CV
_____

## IN THE INTEREST OF C.H.

_____

### On Appeal from the 304th Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. 15-01296-W
_____

# MEMORANDUM OPINION

Before Justices Bridges, Fillmore, and Stoddart
Opinion by Justice Bridges

Mother appeals the termination of her parental rights to her daughter C.H. In three issues, Mother argues the evidence is legally and factually insufficient to prove termination of her parental rights is in C.H.'s best interest or to support the appointment of Dallas County Child Protective Services (CPS) as managing conservator for C.H. We affirm the trial court's termination of Mother's parental rights.

On December 14, 2015, CPS filed an original petition for protection of a child, for conservatorship, and for termination in suit affecting the parent child relationship. The petition alleged, among other things, that Mother knowingly placed or knowingly allowed C.H. to remain in conditions or surroundings which endangered her physical or emotional well-being; engaged in conduct or knowingly placed C.H. with persons who engaged in conduct which endangered the physical or emotional well-being of C.H.; and constructively abandoned C.H., who had been in the temporary managing conservatorship of the Texas Department of Family and Protective

Services for not less than six months, and (1) the Department made reasonable efforts to return C.H. to Mother, (2) Mother did not regularly visit or maintain significant contact with C.H., and (3) Mother demonstrated an inability to provide C.H. with a safe environment.

The petition was supported by the affidavit of CPS caseworker Heather Sanchez who stated that, on December 11, 2015, C.H.'s paternal grandmother came into the CPS office and stated that she no longer wished to care for C.H. and wanted to surrender her to CPS. Sanchez interviewed the paternal grandmother, who stated she was unable to care for C.H. Paternal grandmother stated Mother and Father were living in Memphis, and Mother's other three-year-old daughter, A.C. was living with the maternal grandmother. Paternal grandmother reported that Mother was "prostituting" and using cocaine and marijuana. Paternal grandmother admitted that she occasionally smoked marijuana. At some point in the interview, paternal grandmother changed her mind and stated that she would like to keep C.H. and did not want her to go into foster care. Paternal grandmother gave Sanchez the address of the hotel where Mother was staying.

That same day, Sanchez and another investigator went to the hotel and spoke with Mother and Father. Sanchez told Mother that paternal grandmother brought C.H. to the CPS office and stated she was unable to care for C.H. but later changed her mind and wanted to care for C.H. Sanchez said an investigation was opened and they needed to find a suitable place for C.H. to stay. Mother stated she would like to have C.H., but she did not feel she would be able to care for C.H. When Mother made the statement, Father nodded his head.

Mother stated she was previously arrested for theft of property, and she was on probation until 2017. When asked if she had previously been involved with CPS, Mother stated a case with the Department of Human Services in Memphis was opened because she had an unstable living environment. However, nothing happened with the case because A.C. had been living

with Mother's mother at the time. Mother said she did not work but received a monthly check from social security. Mother admitted participating in prostitution for the last six or seven months, using cocaine three months ago, and using marijuana three days ago.

When asked why C.H. had gone to live with the paternal grandmother, Mother stated there was an agreement worked out whereby Father would move to Texas to live with the paternal grandmother and C.H. and get his life together. The paternal grandmother agreed to keep C.H. until April. By that time, Mother was supposed to get a job and a place to live. Mother stated she believed that the paternal grandmother became angry when she learned that Mother had come to Texas because she did not want Mother to have a relationship with Father. Mother stated she believed her coming to Texas led the paternal grandmother to take C.H. to CPS. After conferring with her supervisors, who advised Sanchez that it had been approved for C.H. to be removed into foster care, Sanchez returned to the hotel and informed Mother and Father of the removal.

At a trial before the court in October 2016, Mother testified that, in December 2015, she had been in Dallas less than a month, and it was her first visit to Dallas. Mother had an arrangement with the paternal grandmother to keep C.H. for six months to give Mother "time to get . . . some stability, place to stay" in Memphis. Only Father and C.H. were to live with the paternal grandmother. C.H. had been living with the paternal grandmother since July 2015. Mother "didn't really want to take [C.H.] back" to Memphis; Mother "just wanted to see [C.H.]." When asked to describe the situation in Memphis between Mother and Father, Mother said she was "not stable," and she was "using drugs" and Father was "being abusive."

Mother was seventeen years old when she got pregnant with C.H. Mother testified she smoked marijuana before she got pregnant with C.H., stopped using drugs while she was pregnant, and began engaging in prostitution and using cocaine "about five months after" C.H.

was born.  C.H. was born in November 2014.  After her birth, C.H. lived "back and forth between the paternal great grandmother" and Mother for the first six months of her life.  C.H. then went to live with the paternal grandmother from July 2015 until the removal in December 2015.  Mother did not see C.H. between July and December 2015.

Mother had been diagnosed as bipolar and schizophrenic at the time of C.H.'s removal and received a social security check as a result.  Mother testified she "over exaggerate[d] the situation to get the check."  Mother's mother was also "on the check because she had previous mental problems."  Social security "gave [Mother] the check instantly" because they knew her mother was "sick so her daughter probably had the same heredity."  Mother testified she was not exhibiting any signs or symptoms of having mental health issues when she went for the evaluation to get diagnosed.  Mother testified she lied for the specific purpose of obtaining a social security check.  The checks were "ongoing" at the time of trial.  Mother testified she was arrested for theft in Memphis and was on probation until 2017.

Mother testified that, after the removal, she visited C.H. but returned to Memphis a week and a half later.  Mother testified she did not have enough money to stay in Dallas because she "was already homeless in Memphis" and she was also on probation.  After Mother returned to Memphis, she did not see C.H. until August 26, 2016.  While in Memphis, Mother did not always have a phone, did not have a place to live, and continued to abuse drugs and engage in prostitution.

Mother did not complete any of her services between January and June 2016, but she "did get stability."  In June 2016, Mother's grandmother gave her a house and a job at one of her nursing homes, A.C. began staying with Mother, and Mother enrolled in a program to get her GED. Mother stopped engaging in prostitution.  Mother was using drugs, including cocaine, "on and off" in June 2016 but she testified she had stopped using drugs by July.  At the end of

August 2016, Mother returned to Dallas, and her caseworker and her lawyer "set up as many services as [they] could," including parenting classes, psychological evaluation, a drug test, and drug and alcohol assessment. In September 2016, Mother was given a hair strand drug test that tested positive for marijuana and cocaine.

Dr. Peggy August conducted a psychological evaluation of Mother on September 7, 2016. Mother reported that A.C. was living with maternal grandmother. Mother also stated she had not completed her high school diploma, and was "working on" getting transportation and a job. Mother reported she had worked in her grandmother's nursing home, but "it did not seem like a current situation." Mother "spoke in terms of getting disability for her nerves," but she did not provide a specific diagnosis. August had "concerns" regarding Mother's "overriding anxiety," but she understood Mother was not being treated for anxiety at the time. Mother stated she had last used cocaine and marijuana "a year and a half to two years ago." August testified "it would be concerning" if testimony at trial showed Mother "had used much more recently than that."

Cherronda Johnson, Mother's CPS caseworker, testified she provided Mother with a copy of her service plan, communicated with her about what services she needed to complete, and attempted to facilitate Mother's services in Memphis by contacting Memphis CPS. Nevertheless, Mother did not make "any progress at all regarding services" between December 2015 and June 2016. Johnson spoke with Mother about her drug use and her income. Mother did not tell Johnson she was still doing drugs but admitted engaging in prostitution. When Mother said A.C. had moved in with her, Johnson told her "that wasn't really good" and advised her to see if maternal grandmother could care for A.C. Mother said she did not have a "good relationship" and "it wouldn't really work." Johnson said she needed Mother's information because she was going to call Memphis CPS and "make sure that everything was fine and that

[A.C.] was being taken care of." Memphis CPS sent out a case worker to perform a drug test, which was negative. Johnson testified she believed that Mother's parental rights should be terminated and that termination was in C.H.'s best interest.

Susan Emert, C.H.'s CASA representative, testified she was assigned to the case in December 2015. Emert spoke with Mother on the phone and texted her, communicating "maybe once every three weeks" to encourage Mother to do her services and to reassure her that C.H. was doing well. Emert asked Mother if she was "busy doing [her] services, and she would say yes." At the time of trial, Emert did not believe Mother had completed all of her services. Emert testified Mother did not have employment or a vehicle, and Emert did not believe that C.H. would be safe with Mother.

At the conclusion of trial, the trial court found that Mother "engaged in extensive drug use, prostitution, has been homeless, has left [C.H.] with people who she shouldn't have left them with"; failed to visit C.H. for almost a year; and failed to complete court-ordered services. As a result, the trial court found Mother "committed the conduct as defined in Chapter 161.001 (b)(1), (d), (e), (n), and (o) and that termination of the parent-child relationship between the mother and the child is in the best interest of the child." The trial court stated it would withhold final judgment until service by publication or substituted service on Father could be proven. On February 3, 2017, the trial court entered a decree of termination. This appeal followed.

In issues one and two, Mother argues the evidence is legally and factually insufficient to support the finding that termination was in C.H.'s best interest. Specifically, Mother argues only limited evidence was presented in support of the best interest finding, and no evidence was presented of the majority of the *Holley* factors.

In conducting a legal sufficiency review in a parental termination case, a court should look at all the evidence in the light most favorable to the finding to determine whether a

reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* This does not mean that a court must disregard all evidence that does not support the finding. *Id.* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.*

Therefore, in conducting a legal sufficiency review in a parental termination case, we must consider all of the evidence, not just that which favors the verdict. *Id.* However, witness credibility issues that depend on appearance and demeanor cannot be weighed by the appellate court; the witnesses are not present. And even when credibility issues are reflected in the written transcript, the appellate court must defer to the factfinder's determinations, at least so long as those determinations are not themselves unreasonable. *Id.*

In reviewing termination findings for factual sufficiency, a court of appeals must give due deference to the factfinder's findings and should not supplant the factfinder's judgment with its own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The court should inquire "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [ ] allegations." *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96

S.W.3d 256, 266 (Tex. 2002)).  In applying this standard, "[a]n appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt."  *Id.* (quoting *In re C.H.*, 89 S.W.3d at 26).

The Department is required to prove by clear and convincing evidence that termination of a parent's right to his children is in the children's best interest. *See* TEX. FAM. CODE § 161.001(2); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012).  In determining whether the evidence is legally sufficient to support a best-interest finding, we consider the evidence that supports a deemed finding regarding best interest and the undisputed evidence, and ignore evidence a factfinder could reasonably disbelieve.  *In re E.N.C.*, 384 S.W.3d at 807.

Nonexclusive factors to be considered in determining whether termination of parental rights is in a child's best interest include:

(1) the child's desires;

(2) the child's emotional and physical needs now and in the future;

(3) any emotional and physical danger to the child now and in the future;

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist the individuals seeking custody to promote the best interest of the child;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and

(9) any excuse for the parent's acts or omissions.

*Id.* (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976)).

Here, C.H. was too young to express her desires.  After C.H. was born in November 2014, Mother did not keep C.H. all the time, and C.H. lived "between the paternal great grandmother" and Mother.  Mother testified she "didn't really want to take [C.H.] back" to

–8–

Memphis in December 2015 but just wanted to see [C.H.]." When asked to describe the situation in Memphis between Mother and Father, Mother said she was "not stable," and she was "using drugs" and Father was "being abusive." Mother testified she smoked marijuana before she got pregnant with C.H., stopped using drugs while she was pregnant, and began engaging in prostitution and using cocaine "about five months after" C.H. was born in November 2014. Mother had been diagnosed as bipolar and schizophrenic at the time of C.H.'s removal and received a social security check as a result. Mother testified she "over exaggerate[d] the situation to get the check." Mother testified she lied for the specific purpose of obtaining a social security check, and the checks were "ongoing" at the time of trial." Mother testified that, after C.H.'s removal in December 2015, she did not see C.H. again until August 26, 2016. During this time in Memphis, Mother did not always have a phone, did not have a place to live, and continued to abuse drugs and engage in prostitution.

Mother did not complete any of her services between January and June 2016. In June 2016, Mother's grandmother gave her a house and a job at one of her nursing homes, and A.C. began staying with Mother. Mother testified she enrolled in a program to get her GED and stopped engaging in prostitution. Mother was using drugs, including cocaine, "on and off" in June 2016 but she testified she had stopped using drugs by July. At the end of August 2016, Mother returned to Dallas, and her caseworker and her lawyer "set up as many services as [they] could," including parenting classes, psychological evaluation, a drug test, and drug and alcohol assessment. However, in September 2016, Mother was given a hair strand drug test that tested positive for marijuana and cocaine.

Johnson testified Mother did not make "any progress at all regarding services" between December 2015 and June 2016. Johnson testified she believed that Mother's parental rights should be terminated and that termination was in C.H.'s best interest. At the time of trial, Emert

did not believe Mother had completed all of her services. Emert testified Mother did not have employment or a vehicle, and Emert did not believe that C.H. would be safe with Mother. Johnson testified C.H.'s foster family was white, and C.H. is African-American, but the foster family "ha[d] a plan" for raising C.H. to understand her culture and heritage, and the foster family's "church family is very diverse." Based on the record before us, we conclude the evidence is legally and factually sufficient to support the finding that the termination of Mother's parental rights was in C.H.'s best interest. *See In re E.N.C.*, 384 S.W.3d at 807; *In re J.P.B.*, 180 S.W.3d at 573; *In re H.R.M.*, 209 S.W.3d at 108; *Holley*, 544 S.W.2d at 371-72. We overrule Mother's first and second issues.

In her third issue, Mother argues the evidence is legally and factually insufficient to support the appointment of CPS as managing conservator. Mother argues section 153.131 of the family code creates a presumption that a parent will be named managing conservator, unless the court finds that such an appointment would not be in the child's best interest "because the appointment would significantly impair the child's physical health or emotional development" or finds that there is a history of family violence involving the parents. *See* TEX. FAM. CODE ANN. § 153.131(a) (West 2014). Mother points out that the termination decree erroneously recites that the "Court further finds that the best interest of the child, S.M.L., Jr. will be served by appointing the Dallas County Child Protective Services Unit of the Texas Department of Family and Protective Services as Permanent Managing Conservator." Mother argues that, because the decree recites the best interest of "S.M.L., Jr." will be served by appointing CPS as managing conservator, the decree contains no finding that it was in C.H.'s best interest for CPS to be appointed managing conservator. Thus, Mother argues, no evidence was presented to rebut the presumption under section 153.131 that C.H. should be placed with a parent.

Conservatorship determinations are subject to review only for abuse of discretion, and may be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Family code section 161.207(a) provides in part that, if the court terminates the parent–child relationship with respect to both parents or to the only living parent, the court shall appoint "a suitable, competent adult," the Department, or a licensed child-placing agency as managing conservator of the child. TEX. FAM. CODE ANN. § 161.207(a) (West 2014). Further, an order terminating the parent–child relationship generally "divests the parent and the child of all legal rights and duties with respect to each other, except that the child retains the right to inherit from and through the parent unless the court otherwise provides." *Id.* § 161.206(b) (West 2014).

In cases where a trial court's termination of the parent-child relationship is reversed, a parent is required to independently challenge a trial court's finding under section 153.131(a) to obtain reversal of the conservatorship appointment. *In re N.T.*, 474 S.W.3d 465, 480 (Tex. App.—Dallas 2015, no pet.). In this case, however, Mother does not challenge the sufficiency of the evidence to support the grounds for termination, and we have already concluded the evidence is legally and factually sufficient to support the finding that the termination of Mother's parental rights was in C.H.'s best interest. In a case where the challenge to a termination is overruled, the trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination pursuant to Family Code section 161.207." *Id.* (quoting *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)). Further, Mother provides no authority for the proposition that she is a "suitable, competent adult" as contemplated by section 161.207(a) or that the presumption in section 153.131(a) applies to a parent whose parental rights have been terminated under Chapter 161. *Id.* at 481. Because it was not necessary to rebut the presumption in section 153.131(a), we conclude the erroneous

best-interest finding concerning appointment of CPS as managing conservator of "S.M.L., Jr." is not relevant to the issue of whether the trial court abused its discretion in appointing CPS as C.H.'s managing conservator.  In reaching this conclusion, we note the decree of termination in this case correctly names C.H. as the child to which it applies, including the portion of the decree ordering that CPS be appointed managing conservator of C.H.  Under these circumstances, we conclude the trial court did not abuse its discretion in appointing CPS as C.H.'s managing conservator. *See id.*  We overrule Mother's third issue.

We affirm the trial court's termination of Mother's parental rights.


/David L. Bridges/
DAVID L. BRIDGES
JUSTICE


170846F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF C.H.

No. 05-17-00846-CV

On Appeal from the 304th Judicial District Court, Dallas County, Texas
Trial Court Cause No. 15-01296-W.
Opinion delivered by Justice Bridges.
Justices Fillmore and Stoddart participating.

In accordance with this Court's opinion of this date, the trial court's decree terminating parental rights is **AFFIRMED**.

Judgment entered January 17, 2018.