**Affirmed and Opinion Filed June 17, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-01110-CV**

**IN THE INTEREST OF S.R. AND N.R., CHILDREN**

**On Appeal from the 196th Judicial District Court**
**Hunt County, Texas**
**Trial Court Cause No. 87100**

## MEMORANDUM OPINION

Before Justices Schenck, Osborne, and Partida-Kipness
Opinion by Justice Partida-Kipness

Mother challenges the legal and factual sufficiency of the evidence to support the termination of her parental rights. Mother's criminal conduct, drug use, severe mental health issues, instability, and violent outbursts justify the trial court's findings that Mother endangered the children's well-being and that termination was in the children's best interest. We, therefore, affirm.

## BACKGROUND

In February 2019, Mother had a psychotic incident and ransacked a house belonging to her own mother (Grandmother) while Mother's two youngest children,

S.R. and N.R., were present.[1] When the Texas Department of Family and Protective Services (the Department) received a referral for neglectful supervision, the Department removed the children and petitioned to terminate Mother's parental rights.

The case went to trial in October 2021. Several witnesses testified concerning Mother's long battle with drug use and mental health problems and their effect on her ability to parent the children, though the witnesses agreed that Mother's most recent bout of treatment in the months before trial had left her in a better condition than she had been in years. Other witnesses testified concerning her extensive criminal history and inability to maintain stable work and housing.

After hearing the evidence, a jury found that there were grounds for termination under Texas Family Code section 161.001(b)(1)(E) and (O) and that termination was in the children's best interest. The trial court terminated Mother's parental rights in accord with these findings. Mother appealed.

**STANDARD OF REVIEW**

To terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy at least one statutory predicate ground listed in 161.001(b)(1) and (2) that termination is in the child's best interest. *See* TEX. FAM. CODE § 161.001(b). "'Clear and

---

[1] We use aliases to refer to those involved in the case in order to protect the minors' identities. *See In re R.R.*, 26 S.W.3d 569, 571 (Tex. App.—Dallas 2000, no pet.).

convincing evidence' means a 'measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (quoting TEX. FAM. CODE § 101.007). This intermediate standard falls between the preponderance standard of most civil proceedings and the reasonable doubt standard of criminal proceedings. *Slicker v. Slicker*, 464 S.W.3d 850, 858 (Tex. App.—Dallas 2015, no pet.). "The proof must weigh more heavily than merely the greater weight of the credible evidence, but the evidence need not be unequivocal or undisputed." *Id.*

In termination cases, we use a heightened standard of review that reflects the elevated burden at trial. *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.). For our legal sufficiency review, we consider all the evidence to determine whether the fact-finder could reasonably form a firm belief or conviction that the termination grounds were proven. *Id.* The reviewing court cannot ignore undisputed evidence contrary to the finding, but it must otherwise assume the fact-finder resolved disputed facts in favor of the finding. *In re C.V.L.*, 591 S.W.3d 734, 748–49 (Tex. App.—Dallas 2019, pet. denied) (citing *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018)). We "consider all the evidence, not just that which favors the verdict," and we assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. *N.T.*, 474 S.W.3d at 475. We disregard all

evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *Id.*

"When reviewing the factual sufficiency of the evidence supporting a termination finding, an appellate court asks whether, in light of the entire record, the evidence is such that a fact-finder could reasonably form a firm conviction about the truth of the State's allegations against the parent." *C.V.L.*, 591 S.W.3d at 749. Further, the appellate court must consider whether the disputed evidence is such that a reasonable fact-finder could not have reconciled that disputed evidence in favor of its finding. *Id.* If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* "And in making this determination, the reviewing court must undertake 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (quoting *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)).

## DISCUSSION

In two issues, Mother contests the legal and factual sufficiency of the evidence to support termination. Mother maintains the evidence is legally and factually insufficient to support the trial court's determinations that she endangered the children's physical or emotional well-being, pursuant to Texas Family Code section

161.001(b)(1)(E),[2] and that termination served the children's best interest. We address each issue in turn.

## I. Grounds for Termination under Texas Family Code Section 161.001(b)(1)(E)

To support termination under subsection (E), there must be clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Endangering conduct under subsection (E) need not be directed at the child. *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021). Nor must the child actually suffer injury. *Id.* "Rather, 'endanger' means to expose to loss or injury; to jeopardize." *Id.* (quoting (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). There must be "more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the result of the parent's conduct, including acts, omissions, and failures to act. *In re A.T.*, 406

---

[2]The trial court terminated Mother's parental rights to S.R. and N.R. under sections 161.001(b)(1)(E) and (O) of the Family Code. Mother does not appeal the finding that termination is proper under section 161.001(b)(1)(O). Because an order terminating a parent's rights under subsection (D) or (E) can be used as a basis to terminate the parent's rights to another child under subsection 161.001(b)(1)(M), terminating rights under (D) or (E) has "significant" collateral consequences. *N.G.*, 577 S.W.3d at 234; TEX. FAM. CODE § 161.001(b)(1)(M). Therefore, "due process requires an appellate court to review and detail its analysis as to termination of parental rights under section 161.001(b)(1)(D) or (E) of the Family Code when challenged on appeal." *In re Z.M.M.*, 577 S.W.3d 541, 543 (Tex. 2019).

S.W.3d 365, 370 (Tex. App.—Dallas 2013, pets. denied). Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re A.R.M.*, 593 S.W.3d 358, 363 (Tex. App.—Dallas 2018, pet. denied) (mem. op. on reh'g). "Specific danger to the child's well-being may be inferred from the parent's misconduct alone." *C.V.L.*, 591 S.W.3d at 750.

A parent's mental health issues may be considered in determining whether a child is endangered if those issues lead the parent to engage in conduct that is detrimental to the child's well-being. *In re C.M.B.*, 204 S.W.3d 886, 895 (Tex. App.—Dallas 2006, pet. denied); *see In re J.K.*, No. 02-21-00199-CV, 2021 WL 5132538, at *5 (Tex. App.—Fort Worth Nov. 4, 2021) (mem. op.). It was undisputed that Mother had serious mental health issues that were poorly managed until the year of trial. Mother was given various diagnoses over the years, ranging from schizoaffective bipolar disorder and PTSD to psychosis and ADHD. At one point in the underlying proceedings, she was treated with five psychotropic medications at once. Witnesses documented several types of delusions that Mother experienced:

- that she saw and heard demons, spirits, and dark figures giving omens that she would harmed;

- that after a car accident, a camera crew followed her around all day to document her affairs;

- that also after the car accident, Mother had "particle atoms" in her inner ear that had come loose, scattered into her brain, and were affecting her thought processes;

- that she was on the brink of developing a revolutionary toothbrush prototype that could floss, dispense toothpaste, and brush at the same time;

- that Mother had purchased Rolex watches for the Department's staff but insisted that she was going to take them back and buy herself a Mercedes Benz as a present;

- that various government officials, including a local sheriff and judge who were not involved in the termination case, had vendettas against her and were conspiring to take her children; Mother believed that the judge was the father of her ex-boyfriend, and she filed a homemade domestic violence protective order against the judge in an attempt, she said, to deter her ex-boyfriend from breaking into her apartment;

- that while she lived at a boarding house, her roommate had placed a hidden camera in her room to spy on her, but the roommate removed the camera any time that the boarding house's overseers went to look for it; and

- that Mother was pregnant and told S.R. that she was going to have a little sister when, in fact, Mother was not pregnant.

Mother's health issues came to a head in a hallucination-fueled incident wherein she tore apart Grandmother's house while the children were present and

tried to take the children from the home. That incident spurred the Department to remove the children. Mother was committed to a mental health institution as a result, where she tested positive for cocaine, methamphetamine, and benzodiazepines. When speaking to doctors, Mother reportedly admitted to moderate use of the former two drugs and regular use of the latter.

There was evidence that Mother's health issues affected her ability to care for the children. For example, at some Department-supervised visits with S.R. and N.R., Mother sat talking to herself in the corner in a daze. A Department observer explained that when one of the children approached Mother to ask for help, Mother was briefly brought back to reality, but she returned to mumbling to herself once the child's question was addressed. Likewise, Mother's eldest daughter "Laura" was in her twenties and had been through the foster care system after Mother's parental rights were terminated in an earlier case. Laura testified that she had cut off contact with Mother for a time due to her drug use and mental health issues, which left Mother in bed all day. Although Laura had developed an affectionate relationship with Mother in recent years, she testified that some of Mother's actions and remarks were "bat-shit crazy."

Conversely, many witnesses were hopeful for Mother's prognosis due to events just before trial. There was evidence that Mother had recently enrolled in a program that gave her long-acting injections, which had dramatically improved her mental well-being. The Department's witnesses conceded that in her condition at the

time of trial in late 2021, Mother was capable of safely caring for the children and that she was not physically dangerous to the children.

But there was some consensus among the witnesses that Mother's condition could easily deteriorate again if Mother returned to drugs or discontinued her medications, as she had done in the past. One of Mother's witnesses compared her condition to a rollercoaster, wherein downswings were common.

The record reflects that Mother had an extensive criminal past and, at times, a criminal present. "A parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *J.F.-G.*, 627 S.W.3d at 313. Between the years of 2010 and 2015, Mother had a half dozen convictions for prostitution, a conviction for family violence, and a drug habit in which she used cocaine multiple times a day. While this case was pending, Mother was arrested for and charged with three more criminal offenses on different occasions—DWI, public intoxication, and possession of a firearm as a felon—the last of which was a felony. Mother initially maintained that all three of these arrests were misunderstandings and that two of the charges had been dismissed. However, she later agreed she had in fact been convicted on the public intoxication charge, which stemmed from an incident wherein she was found intoxicated outside her brother's house at 3:00 a.m., banging on the door and screaming. It was also undisputed that the DWI charge was still pending. With her charges looming, Mother

faced the prospect of further imprisonment, which is "'certainly a factor' the [fact-finder] may weigh when considering endangerment." *Id.* (quoting *Boyd*, 727 S.W.2d at 533); *see In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.) ("[W]hen a parent is incarcerated, he or she is absent from the child's daily life and unable to provide support to the child, negatively impacting the child's living environment and emotional well-being.").

"[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). This is no less true when the "parent engages in drug use during the pendency of a termination suit, when [she] knows [she] is at risk of losing [her] children." *C.V.L.*, 591 S.W.3d at 751. Thus, we have found that "[a] present and future emotional and physical danger to the child" exists when, as here, the record evidence reveals a "long standing struggle with drugs and alcohol" and a "high risk of relapse." *In re B.B.*, No. 05-01-00373-CV, 2002 WL 43744, at *7–8 (Tex. App.—Dallas Jan. 14, 2002, no pet.) (not designated for publication); *cf. C.V.L.*, 591 S.W.3d at 755 (rejecting an endangerment determination when "[t]he Department presented no evidence . . . that Father had relapsed or would relapse in the future").

Mother maintained that she had been sober from drugs and alcohol since 2015. However, during this case, she twice tested positive for drugs, she missed many other mandatory drug tests entirely, and she was arrested for two offenses connected with substance abuse (DWI and public intoxication). When she was asked to address the

inconsistency between her professed sobriety and the evidence of her recent substance abuse, Mother explained that she simply happened to be arrested for intoxication offenses on the only two occasions that she had had anything to drink since the case began in 2019. As to the drug tests, Mother denied any knowledge as to how she had tested positive, but she surmised that one of the test results was likely due to her then-boyfriend, whom she had previously described as a "big-time dope dealer," spiking her drink with both cocaine and methamphetamine, and the other positive test result for cocaine was possibly due to contaminated acupuncture. Mother's health care providers testified that her use of street drugs could worsen her delusions and reduce the effectiveness of her medications. *See In re A.M.*, No. 05-19-00412-CV, 2019 WL 4071998, at *6 (Tex. App.—Dallas Aug. 29, 2019, no pet.) (mem. op.) (citing the connection between "appellant's psychiatric hospital stays, his use of illegal drugs, and his assaults on family members" among the evidence that supported an endangerment finding). Mother also used two types of sleeping pills to rest, which gave some witnesses concerns that Mother's regular sedation could prevent her from responding if the children had a nighttime emergency.

Mother displayed a pattern of instability in her housing and employment, with at least five different residences and eight different jobs in the two-and-a-half-year pendency of the case. "A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *C.V.L.*, 591 S.W.3d at 750.

To Mother's credit, there was evidence that she had made great strides in the months leading up to trial, having graduated from college and improved her housing and health situation. But witnesses testified that Mother made little progress in the first two years of the case, during which a termination trial is usually conducted. It was only in the eight months before trial, in an unusual period of delay created by the Covid pandemic, that she made headway while enrolled in an intensive treatment program, and there was no guarantee that she would continue that program after the termination proceedings concluded. The jury, as the ultimate judge of credibility and weight, was free to conclude that these belated changes did not eliminate the element of danger that Mother had introduced into the children's lives. *See, e.g.*, *In re E.W.A.*, No. 2-07-135-CV, 2008 WL 1867144, at *13 (Tex. App.—Fort Worth Apr. 24, 2008, no pet.) (mem. op.) (affirming a termination against a factual sufficiency challenge despite evidence that the parents had "made significant, if belated, changes and improvements in their lives").

Under this record, we conclude the evidence is both legally and factually sufficient to support the first prong of the termination inquiry. We overrule Mother's sufficiency challenges to the trial court's determination that she endangered the children.

## II.    Best Interest of the Children

The evidence outlined above also tends to establish the second termination prong, best interest, which "is child-centered and focuses on the child's well-being,

safety, and development." *A.C.*, 560 S.W.3d at 631. "Proof of acts or omissions providing grounds for termination under section 161.001(b)(1) does not relieve the petitioner from proving the best-interest element, but the same evidence may be probative of both." *Id.* at 631–32. A best-interest determination is guided by the *Holley* factors : (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent–child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). A court need not have evidence on every factor to make a valid finding as to the child's best interest. *C.H.*, 89 S.W.3d at 27.

Viewed through the lens of this multifactor test, Mother's criminal conduct, persistent drug use, severe mental health issues, violent outbursts, and the uncertainty and instability she imposed on the children weigh heavily in favor of the jury's best-interest determination.

Beyond that evidence, there was also proof that related to certain of the factors individually. As to the children's desires, there was evidence that S.R. wanted to

continue having visits with Mother, but she did not want to return to live with Mother, and N.R. was too young to express her views. As to Mother's parental abilities, there was testimony that Mother would only be able to raise the children by relying heavily on her support system, which largely consisted of relatives, but the Department's witnesses questioned whether some of Mother's relatives were suitable caregivers in light of their criminal history. As to plans for the children and the stability of the proposed home, there was evidence that S.R. and N.R. had bonded with their foster parents, who were unanimously described as exceptional caregivers who had already adopted three foster children in the past. "Evidence about placement plans and adoption are, of course, relevant to best interest." *C.H.*, 89 S.W.3d at 28. Finally, the Department's witnesses testified that overall, termination of Mother's parental rights was in the children's best interest.

We conclude that the evidence is legally and factually sufficient to support the best-interest prong of our termination inquiry. *See J.F.C.*, 96 S.W.3d at 266. The trial court did not err by terminating Mother's parental rights. We overrule Mother's challenge to the best interest finding.

Because we affirm the trial court's termination order, we need not consider Mother's third issue regarding the appointment of the Department as sole managing conservator. *See In re I.N.D.*, No. 04-20-00121-CV, 2020 WL 2441375, at *7 (Tex. App.—San Antonio May 13, 2020, pet. denied) (mem. op.); *In re K.N.D.*, No. 01-

12-00584-CV, 2014 WL 3970642, at *10 (Tex. App.—Houston [1st Dist.] Aug. 14, 2014, no pet.) (mem. op. on reh'g).

## CONCLUSION

The evidence is legally and factually sufficient to support the termination. Accordingly, we affirm the trial court's judgment.


211110f.p05

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF S.R. AND
N.R., CHILDREN

No. 05-21-01110-CV

On Appeal from the 196th Judicial
District Court, Hunt County, Texas
Trial Court Cause No. 87100.
Opinion delivered by Justice Partida-
Kipness. Justices Schenck and
Osborne participating.


In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 17th day of June, 2022.