**Affirm and Opinion Filed June 22, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-01158-CV**

**IN THE INTEREST OF R.W. AND J.W., MINOR CHILDREN**

**On Appeal from the 354th Judicial District Court**
**Hunt County, Texas**
**Trial Court Cause No. 89178**

## MEMORANDUM OPINION

Before Justices Pedersen, III, Goldstein, and Smith
Opinion by Justice Pedersen, III

This is an appeal from the termination of the parental rights of P.W. (Mother) to her two young sons, R.W. and J.W. In a single issue, Mother challenges the sufficiency of the evidence supporting the trial court's finding that termination was in the children's best interest. We affirm the trial court's Order of Termination.

### BACKGROUND

In April 2020, the Texas Department of Family Protective Services (the Department) received a referral based upon concerns involving Mother's untreated mental health, substance abuse, and "household dynamics," which included domestic violence. Following an initial investigation, the case was assigned to Kelsie Garza, a Family Based Safety Services (FBSS) caseworker. At that time, R.W. was

one year old and J.W. was just a month old. They resided with Mother and her husband—the boys' father (Father)—at their maternal grandmother's home in Commerce, Texas. Rather than removing the children from Mother at that time, the Department implemented a safety plan requiring both parents' contact with the children to be supervised by an approved person. The Department also requested that Mother complete parenting services, couples counseling with Father, and a mental health evaluation.

This program of voluntary working of services was not successful. Mother continually missed her appointments required under the safety plan and failed to create or take the children to their medical appointments. Garza explained that a typical FBSS case lasts between three and six months. The services Mother was requested to complete could have been finished in three months. But by October, more than five months since the initial investigation, Mother had failed to *begin* most of the services, and Garza had concerns that included "missed doctors' appointments for the children, the lack of cooperation with the department, participation in the services, and positive drug tests for [Father]."[1]

The Department decided to seek a court order for compliance with the services that initially were merely requested in November 2020. Although it obtained that

---

[1] At the time of trial, Mother was still legally married to Father, but he had not lived with her for a number of months. Prior to trial, Father voluntarily relinquished his parental rights to R.W. and J.W. We recount his conduct only where it gives context to the Department's concerns.

order, and although Garza continued to work closely with Mother, Mother failed to participate in services and to comply with the safety plan.

On December 4, 2020, the Department filed its Original Petition for Protection of a Child, for Conservatorship, and For Termination in Suit Affecting the Parent-Child Relationship, which sought possession of the children and temporary orders appointing the Department as their sole managing conservator. The Department then took possession of the children.

Once the children were removed from Mother's custody, her case was overseen Stacie Graf, a conservatorship specialist employed by the Department. Graf created a service plan that addressed the Department's concerns related to Mother's mental health, missed medical appointments, family violence, and Father's drug use. In January 2021, Mother agreed to the service plan and understood that if she failed to complete its goals and services, her parental rights could be terminated. She did complete parenting and domestic abuse classes. However, in January she tested positive for methamphetamine. She continued to test positive throughout 2021, and, as a result, the Department suspended her visits with the children in April of that year. She was unsuccessfully discharged from both substance abuse counseling and individual counseling.

The case was tried on November 18, 2021, and December 1, 2021. At the conclusion of trial, the trial judge acknowledged the efforts of the Department to work with Mother, stating:

I want to say that I am impressed and grateful for all the efforts that I heard in this trial that the Department made to try to work with the mother. A lot more effort than I normally see in these cases . . . I think they went above and beyond. And it's very clear from this record that they made every single effort to serve this mother and to serve these children to the best of their ability.

The trial judge found that the Department had met its burden and that terminating Mother's parental rights was in the children's best interest. She signed the Order of Termination.

This appeal followed.

**THE BEST INTEREST OF THE CHILDREN**

A court may order involuntary termination of parental rights only if the court finds that (1) the parent has committed one of a specified list of child-endangering acts or omissions, TEX. FAM. CODE ANN. § 161.001(b)(1), and (2) termination is in the best interest of the child, *id.* § 161.001(b)(2). In this case, the court found four section-161.001(b)(1) acts,[2] but Mother challenges only the finding that termination was in the best interest of her children.[3] We note at the outset that the same evidence

---

[2] The court found sufficient evidence of the grounds listed in sections 161.001(b)(1)(D), (E), (O), and (N).

[3] The Texas Supreme Court has directed us to review the evidence supporting findings on grounds 161.001(b)(1)(D) and (E), even if a termination appeal is being resolved on a different ground, because those findings may have an effect on subsequent proceedings involving the parent. *See In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (citing FAM. § 161.001(b)(1)(M)). However, the supreme court's directive applies only when the parent seeks review of the (D) and (E) findings. *Id.* at 237 ("Allowing section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal *when the parent has presented the issue to the court* thus violates the parent's due process and due course of law rights.") (emphasis added). The trial court's findings on sections 161.001(b)(1)(D) and (E) are not presented for our review in this case.

can be relevant to both section 161.001(b)(1) termination grounds and the child's best interest. *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied).

## Standards of Review

Given the constitutional magnitude of the interests at stake in parental termination cases, the trial court's findings must be made by clear and convincing evidence. FAM. § 161.001(b); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002) (quoting FAM. § 101.007). Our standards of review reflect this heightened burden of proof.

In evaluating the evidence for legal sufficiency, we view the evidence in the light most favorable to the finding, assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could have done so, and disregard all contrary evidence that a reasonable fact finder could have disbelieved or found incredible. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). If no reasonable fact finder could form a firm belief or conviction that the matter to be proven is true, the evidence is legally insufficient. *Id.* at 113.

When reviewing the factual sufficiency of the evidence, we consider all the evidence and determine whether the fact finder could reasonably form a firm belief or conviction that the termination grounds were proven. *In re N.T.*, 474 S.W.3d 465,

475 (Tex. App.—Dallas 2015, no pet.). We consider whether the disputed evidence is such that a reasonable fact finder could not have reconciled the disputed evidence in favor of its finding. *Id.* If the disputed evidence is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

## The *Holley* Factors

Mother contends that the only evidence at trial showing termination was in the best interest of her children "consisted of conclusory statement made by the Department and CASA." We disagree. The Department offered significant evidence concerning the factors we evaluate to determine whether termination is in the best interest of a child. Those factors include (1) the child's desires, (2) the emotional and physical needs of the child and the emotional and physical danger to the child now and in the future, (3) the parental abilities of the individuals seeking custody, (4) the plans for the child by those individuals and the stability of the home, (5) the plans for the child by the agency seeking custody and the stability of the proposed placement, and (6) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (7) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). A best interest finding need not be supported by evidence of every *Holley* factor. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a

–6–

strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.*

In this case, the children were too young to express desires concerning their caregivers. But we address the remaining *Holley* factors, grouping them as helpful to avoid repetition.

*The emotional and physical needs of the children and the emotional and physical danger to the children now and in the future.*

*The parental abilities of Mother.*

Garza's testimony indicated that Mother was unable to meet some of her young children's most basic needs despite continued instruction. One example was their need for safe sleeping surroundings. Despite being repeatedly instructed that the children needed to sleep in their beds, Mother continued to put J.W. to sleep in a bouncer and R.W. to sleep strapped in a car seat. Similarly, Mother had instructions from the children's pediatrician—confirmed by Garza—concerning how much J.W. should be fed, and Garza repeatedly explained the importance of feeding the baby the proper amount, but Mother consistently fed him up to twice that amount. Garza reported as well that she made repeated efforts to impress upon Mother the importance of regularly bathing the children and tending to their nails.

J.W. had significant health issues during this time. Mother took him to the hospital after he suffered a seizure in August, and she was instructed to take J.W. to

a neurologist for a follow-up appointment.[4] But despite Garza's assistance in scheduling and re-scheduling appointments, Mother never took him to see a neurologist, despite the fact that the seizures continued to occur while J.W. was in Mother's care. According to Garza:

> There were sometimes she didn't make the appointment at all. And [the children's grandmother] or myself would have to make the appointments for her. There were several times she missed an appointment because she overslept or she was sick or out of town or she just couldn't remember.

Mother also failed to take J.W. to a cranial-facial specialist as recommended to address a problem he had with limited neck mobility. Indeed J.W.'s pediatrician dropped the child from his care after repeated missed appointments. Garza helped Mother set up an appointment with a new doctor, but Mother missed that appointment.

Garza gave detailed testimony concerning the months she spent working with Mother. She testified that three months in, Mother was trying to address her mental health concerns, which were certainly linked to her parenting failures. She completed a psychiatric evaluation during the Department's FBSS efforts and was prescribed medications after being diagnosed with a bipolar condition, anxiety, and

---

[4] This hospital visit actually resulted in another Department referral based upon the hospital's hygiene concerns. When Garza went to follow up on this referral, she observed that the baby "had a rash on his bottom, a reddish mark on his neck. It appeared he had a ringworm or a ringworm-like circle on his stomach. And he did have dirt between his toes and dirt underneath his fingernails."

depression. She was supposed to go to MHMR for medication management follow up, but she was discharged for lack of attendance.

Garza testified that she did not see any change in Mother's behavior in terms of reducing the risks for the children. Again, Garza referred to the multiple missed medical appointments for the children. She related that Mother often offered lack of transportation as an excuse but that for almost every visit, Mother had a transportation option and chose not to take it.

Garza was asked specifically whether Mother could see to the emotional and physical needs of the boys. Garza replied that she did not believe Mother could, because Mother herself would tell Garza that she was not physically able to do so. Mother told her on a number of occasions that she would like her mother, the children's grandmother, to have temporary custody of the children.[5] Garza concluded that: "Her behavior did not show to me that she would be able to care for the children."

When Graf was asked whether Mother could meet the physical and emotional needs of the children, she testified that although Mother "has a big heart and very good intentions," she could not meet those needs on her own. Graf stressed that Mother relies on others in every aspect of her life, including keeping a roof over her

---

[5] In this vein, the record establishes that Mother had given birth to four children before R.W. and J.W. The father of the first child, a daughter, was awarded her custody. Mother voluntarily placed her three sons born next with family friends. She acknowledged at trial that she did not assist in the support of any of these children and had made no effort to regain their custody.

head. Graf concluded that even if Mother wants to believe she can, she has not "demonstrate[d] that she's able to provide for the kids' needs, much less her own."[6]

Our review of the record did not reveal instances of good judgment by Mother in dealing with her children's needs or even good faith efforts to develop and improve her parenting skills. We conclude these factors weigh in favor of termination.

*Mother's plans for the child and the stability of the home.*

Before the children were removed, Garza testified, they lived with Mother at the home of their maternal grandparents. But throughout this time period—although either five or six adults lived in the home—the family relied on the Department for food and diapers and for help with rent and utilities.[7] The children were present in the house during episodes of domestic violence, first between their parents and later between Mother and her sister who lived in the same house. The children lived in

---

[6] More than one witness expressed concern about Mother's ability to take care of herself. Along with her financial and mental health issues, Mother testified concerning physical health issues. She had visited a hospital because she "was hurting in [her] chest." She was told then that she has congestive heart failure and was advised to see a heart doctor. Mother had not identified a heart doctor or made an appointment to see a heart doctor "because [she] [hadn't] had the time." Mother was not taking any medication for her congestive heart failure. At the time of trial, Mother also testified that she believed she was pregnant. (She had taken a pregnancy test while at the hospital for her chest pain.) She did not know how long she had been pregnant or her expected due date. She explained she had lost her Medicaid card and was waiting to get her Medicaid back before finding a heart doctor and obtaining prenatal care. Mother said she had filed for a new Medicaid card in October 2021, but she explained the online system did not provide any indication on how long it would take to get her card replaced.

[7] Mother did not work but received monthly disability payments. When asked to explain the disability, she testified "I can't focus[] on one thing. I can't read and write. And they said that I won't be able to hold a job, and do math."

one residence, but in fact their housing situation did not bear the hallmarks of stability.

When asked about Mother's housing situation after the children were removed, Graf testified:

> [Mother] did not have stable housing. She did from time to time, but it was not consistent. She did reside with her mother for the majority of the first half of the case. However, if there were ever any family grievances, then [Mother] was kicked out of the house and she was either living on the streets, living in an apartment with a friend, living at the laundry mat or living in [Father's] vehicle.

Graf went on to state that Mother had "stable housing" since she moved into her current residence. Graf visited that home, which Mother rented month-to-month from—and shared with—two friends. Mother provided assistance to one of the friends, who had a number of medical issues. Graf testified to cluttered,[8] dirty, and unsafe conditions for young children throughout the house. Most concerning was Graf's testimony that the three adults also shared the house with twenty-six animals. Photographs illustrated Graf's descriptions of a "pile of fresh feces that ha[d] obviously been accumulated overtime by multiple animals right outside the children's bedroom"; of "smeared, dried, trampled feces" on plywood floors in a number of rooms; and of "pools of urine" throughout the house. Mother showed Graf child-appropriate bedding she had purchased for the boys, but she said "nothing" about the filthy condition of the residence. Graf expressed concerns about the boys'

---

[8] Pictures showed the house—inside and out—piled high with containers and items the residents salvaged from storage containers and hoped to re-sell.

physical health were they to move into the home. She also expressed concern for Mother's ability to care for them while she took care of her friend's medical needs.

Mother's only plan for herself and the children was for her sister, A.P., to help her comply with the Department's service plan. A.P., herself a mental health caregiver, testified at trial to a willingness to help Mother, but she had no answer as to why she had never been able to help Mother during the entire period of Mother's involvement with the Department.

We conclude this factor weighs in favor of termination.

*The Department's plans for the child and the stability of the proposed placement.*

The Department sought and received permanent managing conservatorship of the boys with the express goal of their being adopted. Graf testified that the boys' current foster parents are "adoption motivated" and that the Department's plan was to keep the boys in that home if Mother's rights were terminated. Graf testified that she believed the current foster parents could see to the boys' emotional and physical needs. She spoke of the training they undertook to become licensed as foster parents, including training for children who require particular emotional care following trauma. Graf opined that the foster family is very stable: the parents have been married many years and have raised two healthy children of their own who remain close to their parents.

Graf also testified to the improvement in J.W.'s development while in the care of this family. He successfully completed the Department's Early Childhood

Intervention program and was much more mobile. He continues seeing a neurologist for follow-up appointments but had not had a seizure since January 2021. The foster parents have no difficulty maintaining a schedule and a routine for the boys or getting them to medical appointments.

The boys' CASA volunteer also testified that the foster family was providing a stable home for them and that the boys appeared happy and bonded with the foster parents.

Mother expresses concerns in this Court that her sons' current foster home is their third placement and that, at the time of trial, they had only been in that home for approximately two months. Graf explained that while the prior placement had been a positive one for the children, the family was not motivated to adopt, and so the Department looked for and found the current placement. Moreover, although the Department appeared hopeful at the time of trial that the current placement would result in an adoption, the Department retained conservatorship of the boys. We can infer from the Department's efforts throughout its involvement with these children that it will continue to monitor the boys' progress and that any adoption will only take place after appropriate time and evaluation.

We conclude this factor weighs in favor of termination.

*The acts or omissions by Mother that may indicate the existing parent-child relationship is not a proper one.*

*Any excuse for Mother's acts or omissions.*

We have identified at some length Mother's acts and omissions reflecting that her existing parent-child relationship was not a proper one. For some seven months, the Department offered her services and assistance to help her learn to care for herself and the children; she was unable to do so. Despite significant efforts to address all of Mother's issues with household costs, transportation, maintaining a schedule, and dealing with domestic violence, she made no apparent progress in addressing her own well-being or that of her two children. Indeed, as the Department points out in its briefing in this Court, it appears that Mother missed every appointment with J.W.'s doctors over this period of seven months. Indeed, Mother herself stated a number of times that she wanted to give temporary custody of the boys to her mother, because she just could not manage their care and meet the Department's requests that she work her services. The record establishes, however, that Mother did not work the services after the children were removed either. Instead, she began using methamphetamine and forfeited her ability even to visit her children.

Mother points to the fact that she suffered from mental health problems that were not properly treated. But the Department made every effort to help her get the treatment she needed, and Mother failed to attend appointments and to take prescribed medication. We agree that mental illness alone is not sufficient grounds for terminating the parent-child relationship. *In re S.B.*, No. 05-20-00055-CV, 2020 WL 5361877, at *7 (Tex. App.—Dallas Sept. 8, 2020, no pet.) (mem. op.). However,

–14–

"'when a parent's mental state allows [her] to engage in conduct [that] endangers the physical or emotional well-being of the child, that conduct has a bearing on the advisability of terminating the parent's rights.'" *Id.* (quoting *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ)). As Graf testified, Mother was not able to make the positive behavioral changes that were needed to allow her to be able to meet her own needs and the needs of her sons.

We conclude these factors weigh in favor of termination.

### The Trial Judge's Assessment of Best Interest

After the parties rested, the trial court found that the Department had "absolutely" met its burden to prove by clear and convincing evidence each of the four section-161.001(b)(1) grounds on which it sought termination, namely that Mother had:  allowed the children to remain in surroundings that endangered their physical or emotional wellbeing (ground D), endangered the children by engaging in conduct that placed them in dangerous situations (ground E), failed to comply with court-ordered services (ground O), and constructively abandoned the children (ground N). The trial judge went on to address the *Holley* factors on the record. She walked through them one by one, finding that she had heard evidence sufficient to persuade her that every one of the factors weighed in favor of termination of Mother's rights. The judge concluded by acknowledging that she had also heard evidence of Mother's disability and mental health issues; she conceded the significance of those problems. But she emphasized:

They don't justify the use of drugs. They don't justify [Mother's] failure to comply with services that were specially adapted to meet her disability and mental health needs. And they don't justify me having children in foster care for over a year, or almost a year, while a mom hasn't even made enough ground work, that I can even consider returning the children to her.

So any excuse would be insufficient and certainly weigh in favor of terminating the mother's parental rights in the best interest of both J.W. and R.W.

We acknowledge that a strong presumption exists that a child's best interest will be served by preserving the parent-child relationship. *In re J.F.C.*, 96 S.W.3d at 294. However, the prompt and permanent placement of children in a safe environment is also presumed to be in their best interest. FAM. § 263.307(a). We conclude that the Department has carried its heavy burden to establish that terminating Mother's parental rights was in the best interest of these two children. Whether viewing the evidence in the light most favorable to the finding or viewing all the evidence before the trial court, a reasonable fact finder could have formed a firm belief that terminating Mother's parental rights was in the best interest of her children. *See In re K.M.L.*, 443 S.W.3d at 112; *In re N.T.*, 474 S.W.3d at 475.

We overrule Mother's single issue.

## CONCLUSION

We affirm the trial court's Order of Termination.

211158f.p05

/Bill Pedersen, III//
BILL PEDERSEN, III
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF R.W. AND J.W., MINOR CHILDREN

On Appeal from the 354th Judicial District Court, Hunt County, Texas Trial Court Cause No. 89178. Opinion delivered by Justice Pedersen, III. Justices Goldstein and Smith participating.

In accordance with this Court's opinion of this date, the order of the trial court is **AFFIRMED**.

Judgment entered this 22nd day of June, 2022.