**AFFIRMED and Opinion Filed July 16, 2024**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-24-00098-CV

### IN THE INTEREST OF R.H., A CHILD

**On Appeal from the 305th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-22-00857**

## MEMORANDUM OPINION
Before Justices Partida-Kipness, Nowell, and Smith
Opinion by Justice Smith

Mother appeals the trial court's final order in a suit affecting the parent-child relationship in which the trial court terminated her rights to her infant daughter, R.H., as well as terminated the rights of the alleged or unknown father, and appointed the Department of Family and Protective Services as permanent managing conservator.[1] In three issues, she contends the evidence is legally and factually insufficient to support the trial court's finding that termination was in the best interest of R.H. and

---

[1] When the appellate record in this case was first filed, we questioned our jurisdiction over this appeal because the order terminating Mother's and the alleged or unknown father's rights did not appoint the Department or any other person as managing conservator of R.H. In response, the trial court entered a Nunc Pro Tunc Decree of Termination, which the clerk filed in a supplemental clerk's record with this Court. The Nunc Pro Tunc Decree of Termination appoints the Department as permanent managing conservator of R.H.

to support the trial court's appointment of the Department as managing conservator. Mother does not challenge the grounds on which her rights were terminated.[2] Because we conclude the evidence was legally and factually sufficient, we affirm.

## Evidence Presented to Trial Court

Mother has struggled with heroin use for years. She testified that she used drugs to help cope with her depression and anxiety. Her two older children, ages seven and five at the time of the first evidentiary hearing, lived with her mother (maternal grandmother). Mother was incarcerated when both children were born. Although she stayed sober during various times after her children were born, she relapsed again while she was pregnant with R.H. because she and maternal grandmother had a fight and she was kicked out of the house. She went to Parkland to try and detox but left before she finished the program. Both Mother and R.H. tested positive for heroin, methamphetamines, and amphetamines when R.H. was born. R.H. remained in the hospital for some time after her birth and then was placed in a foster home.

Mother did not seek managing conservatorship of R.H. at trial. Instead, she sought for R.H. to be placed with Vicki Gutierrez. Mother explained that she was still working on some things and trying to lay the groundwork for her support

---

[2] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (R) (providing parent's rights may be terminated for knowingly placing or allowing the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, engaging in conduct or knowingly placing the child with persons engaging in conduct which endangers the physical or emotional well-being of the child, or causing the child to be born addicted to alcohol or a controlled substances).

network before she could take full custody of R.H. Mother requested to be named a possessory managing conservator so that she could remain a part of R.H.'s life.

According to the Department, Mother had not been able to provide a clean sample during the pendency of the case to show that she was no longer using drugs. The Department requested drug testing each month, and appellant went only three times. Mother testified that she could not make it to the requested testing due to the short notice of the request and her work schedule. She believed her medication—Suboxone for opiate dependency—was causing positive results. She explained the positive results could not be from drug use because she had been clean since she gave birth to R.H.

Mother further testified that, except for one, she made each of her weekly supervised visits to see R.H. She also testified that she completed her parenting classes and received a certificate, was going to counseling, and had completed her psychological and psychiatric evaluations. She was also seeing a drug counselor at Parkland but had not begun the intensive outpatient drug treatment program as recommended by the Department.

The caseworker for the Department testified that Mother failed to take her parenting classes at the place to which they referred her and that the Department had not approved of her counselor or received confirmation that she had completed her psychiatric evaluation. The caseworker had verified Mother's employment and did not have any concerns with Mother's home after visiting it. However, the

caseworker testified that she did not believe Mother could parent R.H. because of her continued drug use and because she was not parenting her other two children.

Maternal grandmother testified that, when Mother was living with her, she caught Mother in the bathroom using drugs. Mother had a needle in her arm while her son, her middle child, was in the bathtub. Although Mother and maternal grandmother were currently joint managing conservators of Mother's two older children, maternal grandmother was seeking to terminate Mother's parental rights to those children. Maternal grandmother explained that she wanted Mother to continue to be involved with her two oldest children but was seeking termination so that the children were not as exposed to Mother's lifestyle choices and so that Mother did not have as much say in their travel. At the time of trial, maternal grandmother would not let Mother be around the children without supervision.

Initially, maternal grandmother declined to take R.H. because she physically could not care for her. She had broken her hip and could not walk without assistance. Maternal grandmother's preference was that R.H. remain with the foster family. She had no concerns about R.H.'s care in the foster home, and the foster parents had embraced Mother's older children. R.H.'s foster mother and maternal grandmother had a nice working relationship in which they arranged for Mother's children to see each other a few times a month. However, if R.H. was to be removed from the foster home, maternal grandmother would be willing to care for her. Maternal

grandmother did not know anything about Gutierrez, the person with whom Mother requested placement of R.H.

The CASA advocate recommended termination due to Mother's failed drug tests. The CASA advocate did not recommend placing R.H. with Gutierrez because her home was unclean and cluttered and would not allow a young child to move around freely. Although the Department had previously approved Gutierrez's home for Gutierrez's daughter and her daughter's foster child, there were rodents when the Department conducted the home study regarding R.H. When the CASA advocate revisited Gutierrez's home the second time, there had been no improvement. The CASA advocate was unable to visit again because Gutierrez told her she was too busy. Ultimately, the Department denied Gutierrez's home as a placement option.

Mother testified that her first caseworker approved of Gutierrez's home and that R.H. was going to be there during the pendency of the case. When Mother was assigned a new caseworker, the placement was denied. Mother and Gutierrez believed it was for personal reasons, specifically that the new caseworker had been adopted herself and wanted R.H. to live with people who had more money than Gutierrez. Gutierrez disagreed there were rodents present when the Department conducted the home study. She also testified that she decluttered the house as requested but that CASA never came back or even contacted her about coming back.

Gutierrez explained that she had known Mother for about four years. She had not met R.H.; she had only seen pictures of her. Gutierrez testified that, if R.H. was

placed with her, she would abide by court orders and set appropriate boundaries when allowing Mother to have contact with R.H.

The caseworker for the Department testified that R.H. had been in the same foster home since she was discharged from the hospital. She had bonded with her foster parents, their home appeared to be "really safe," and she did not see any concerns. The CASA advocate also visited R.H. in her foster home monthly and did not have any concerns with the home. R.H.'s foster mother stayed home to care for R.H. when she was sick and updated the caseworker on R.H.'s progress. The Department's plan was for the foster parents to adopt R.H., and the CASA advocate testified that she hoped the foster parents would be approved for adoption.

R.H.'s foster mother testified that R.H. was on Clonidine for drug withdrawal when she was placed in their home and took it for approximately two weeks. She was thirty-five days old at the time of placement. Foster mother testified that R.H. was "right on target developmentally" and was not delayed in any way. On several occasions, foster mother had to take R.H. to urgent care. First for a diaper rash, and next for an upper respiratory infection, which progressed into pneumonia and then RSV and resulted in another diaper rash due to the medication prescribed. Foster mother acknowledged that R.H. was petite for her age but testified that the pediatrician had not expressed any concern about her weight.

Foster mother encouraged sibling visitation and, over the summer, R.H. saw her siblings a couple times a month. The foster parents had no other children in their home, and their plan was to adopt R.H. if Mother's rights were terminated.

**Sufficiency of the Evidence Standard of Review**

The involuntary termination of parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE § 161.001(b). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. To terminate parental rights, the evidence must show that the parent committed one of the acts enumerated in section 161.001(b)(1)(A)–(V) and that termination is in the best interest of the child. *Id.* § 161.001(b).

In determining whether the evidence is legally sufficient in a parental termination case, we review all the evidence in the light most favorable to the trial court's finding and determine whether a rational trier of fact could have reasonably formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We resolve any disputed facts in favor of the finding unless a reasonable factfinder could not have done so, and we disregard all evidence a reasonable factfinder could have disbelieved or found incredible. *Id.*

In conducting a factual sufficiency review, we give due deference to the trial court's finding and determine if, based on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against

the parent. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam); *In re C.H.*, 89 S.W.3d 17, 25–27 (Tex. 2002). The trial court is the sole arbiter of the credibility and demeanor of the witnesses, and we shall not supplant the factfinder's judgment with our own. *In re H.R.M.*, 209 S.W.3d at 108–09. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

### Best Interest of the Child

When deciding whether termination is in the child's best interest, we look to certain non-exclusive factors identified by the supreme court in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 372. "The absence of evidence about some of these considerations would not preclude a factfinder from

–8–

reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d at 27.

In Mother's first two issues, she argues that the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in R.H.'s best interest. She contends instead that the evidence proved that placement with Gutierrez and not terminating Mother's rights was in the child's best interest. With the above principles in mind regarding the standard of review, we evaluate the evidence presented as to each *Holley* factor.

### 1. *The desires of the child.*

R.H. was placed into foster care when she was thirty-five days old. At the time of the final hearing, she was a little over one years old. Thus, she was too young to express her desires, and evidence regarding this factor was not at issue.

### 2. *The emotional and physical needs of the child now and in the future.*

The parties did not present evidence of any specific emotional and physical needs of R.H. in the future. However, the evidence showed that R.H.'s foster parents administered medication for drug withdrawals when R.H. was first placed with them, sought care for her when she was sick, and took her to the pediatrician for regular checkups. Mother did not believe that R.H. was having withdrawals and did not think that the hospital should have prescribed the medication in the first place. The foster mother and maternal grandmother were also tending to R.H.'s emotional

–9–

needs by arranging time each month for R.H. to visit with her siblings. Continuing a healthy relationship between family members would be in R.H.'s best interest.

3. *The emotional and physical danger to the child now and in the future.*

As to evidence regarding the emotional and physical danger to R.H., Mother concedes she had a significant drug problem, and the Department highlights that Mother used drugs during each of her three pregnancies and continued to test positive for controlled substances during the pendency of this case. Additionally, maternal grandmother testified that she was seeking to terminate Mother's rights to her two older children because of Mother's continued drug use and lifestyle choices. Allowing Mother to parent or co-parent, or even have access to R.H. while she continued using heroin or methamphetamines would place R.H. in physical or emotional danger.

4. *The parental abilities of the individuals seeking custody.*

Mother was not seeking custody of R.H. at trial because she had not finished drug treatment and was still trying to establish a support network. However, Mother did request that R.H. be placed with Gutierrez and that her rights not be terminated so that she could continue to be involved in R.H.'s life and ultimately care for R.H. once she was able to complete rehabilitation and remain sober. The Department caseworker testified that Mother did not have the parental abilities to care for R.H. at the time of trial. The Department had been involved with Mother since the birth of her first child, and Mother had not demonstrated that she was able to change her

lifestyle. In fact, Mother was not parenting her two older children at the time, and maternal grandmother was seeking termination of her rights as to those children because of Mother's continued drug use and inability to parent. Mother's past performance as a parent could certainly have a bearing on her fitness to provide for R.H. *See id.* at 28 (concluding court of appeals erred in not considering father's prior history of child neglect as a factor bearing upon the finding that termination would be in the child's best interest because past performance as a parent could certainly have a bearing on a parent's fitness to provide for the child).

As to Gutierrez, Mother argues that the Department had approved her daughter and her daughter's foster child to live with Gutierrez and there had been no complaints regarding Gutierrez's home. The evidence does not support Mother's assertion. The Department caseworker and the CASA advocate testified about their concerns regarding Gutierrez's home, and the Department denied placement with her. Additionally, Gutierrez had never met R.H., and there was no evidence presented regarding her ability to parent a child.

Mother asserts that there was no evidence admitted regarding the parenting abilities of the foster parents except that the child was doing well, was well cared for, and had bonded with them. The Department also points to evidence that the foster parents had provided R.H. with a stable home since she was thirty-five days old, R.H. was doing well and was on target for her age, the foster mother took R.H. to all her post-release medical appointments, the foster mother took R.H. to the

–11–

doctor and stayed home with her when she was sick, and the foster mother regularly scheduled time with R.H.'s maternal grandmother so that R.H. could visit her siblings. This evidence demonstrates the foster parents' ability to properly care for R.H., as they had been doing so for approximately one year with no concerns from the Department or the CASA advocate.

5. *The programs available to assist these individuals to promote the best interest of the child.*

There was no evidence presented at trial regarding outside programs to assist the parties besides the services offered to Mother to help her reunite with R.H. Although Mother testified that she completed many of those services, she did not complete them through the service providers the Department specified. Most importantly, she had not begun the intensive drug treatment program required by the Department or demonstrated an ability to stay sober.

6. *The plans for the child by these individuals or by the agency seeking custody and the stability of the home or proposed placement.*

Mother testified that she wanted R.H. to be placed with Gutierrez so that she could remain a part of R.H.'s life, as she had with her other two children. Although there was evidence that Gutierrez's home was cluttered and had a rodent problem, Mother argues the home had previously been approved by the Department. The Department, however, denied placement with Gutierrez after it conducted its home study for R.H.'s placement. Furthermore, the evidence showed that maternal grandmother was concerned with Mother being involved in her older children's lives

to the point she was seeking termination of Mother's rights. Thus, the evidence did not demonstrate that placing R.H. with Gutierrez and allowing Mother continued involvement was in R.H.'s best interest.

The Department's plan was for R.H. to be adopted by her foster parents. The CASA advocate and maternal grandmother approved of this plan. At the time of trial, R.H. had lived with her foster parents for approximately one year, and they had been caring for her medical and emotional needs. Besides Mother's concerns with R.H.'s health issues, which were being addressed by the foster mother through continued medical care, there were no issues with the foster parents' home or their care of R.H. Thus, the evidence showed that the foster parents' home was a stable environment for R.H. and that R.H. and the foster parents had bonded over the last year.

> 7. *The acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one and any excuse for the acts or omissions of the parent.*

Mother acknowledges that she had a significant drug history, but she contends she had several extended periods of sobriety and was in treatment. At the hearing, Mother maintained that R.H. was not born addicted to drugs and was not going through withdrawals at the hospital. She further maintained that her prescribed medication was causing her drug tests to come back positive and that she was not using drugs again.

As the sole arbiter of the credibility and demeanor of the witnesses, *see In re H.R.M.*, 209 S.W.3d at 108–09, the trial court was free to disbelieve Mother's excuses and explanations for her and R.H.'s positive drug tests. Moreover, Mother acknowledged that she had not yet begun the intensive drug treatment program and had only completed a drug counseling program. Placing R.H. with Gutierrez so that Mother could continue to have access to R.H. while she still struggled with her drug addiction would not be in the best interest of R.H.

*Conclusion*

Based on our review of the record, we conclude that the evidence is legally and factually sufficient to support a firm belief or conviction that terminating the parent-child relationship between Mother and R.H. was in the best interest of the child. We overrule Mother's first and second issues.

**Appointment of the Department as Permanent Managing Conservator**

In her third issue, Mother argues that the evidence was legally and factually insufficient to support the trial court's appointment of the Department as permanent managing conservator. She again argues that Gutierrez should have been named managing conservator so that her rights did not need to be terminated. She urges that the trial court could have instead implemented safeguards regarding her access to R.H. However, as this Court has previously explained, because we have overruled Mother's challenge to the termination of her parental rights, "the trial court's appointment of the Department as sole managing conservator may be considered a

–14–

'consequence of the termination pursuant to Family Code section 161.207.'" *In re N.T.*, 474 S.W.3d 465, 481 (Tex. App.—Dallas 2015, no pet.) (citations omitted); *see also* TEX. FAM. CODE § 161.207(a) ("If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child."). As discussed above, the record failed to demonstrate that Gutierrez was "a suitable, competent adult" to be appointed as R.H.'s managing conservator. *See* TEX. FAM. CODE § 161.207(a). Thus, having terminated Mother's rights and all potential fathers' rights, the trial court properly appointed the Department as permanent managing conservator. We overrule Mother's third issue.

## Conclusion

Having overruled Mother's three issues on appeal, we affirm the final order terminating Mother's parental rights and appointing the Department as managing conservator of R.H.

/Craig Smith/
CRAIG SMITH
JUSTICE

240098F.P05

–15–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF R.H., A CHILD

No. 05-24-00098-CV

On Appeal from the 305th Judicial District Court, Dallas County, Texas Trial Court Cause No. JC-22-00857. Opinion delivered by Justice Smith. Justices Partida-Kipness and Nowell participating.

In accordance with this Court's opinion of this date, the trial court's February 15, 2024 Nunc Pro Tunc Decree of Termination is **AFFIRMED**.

Judgment entered this 16th day of July 2024.